In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2617

DEBORAH JACKSON, ET AL.,

*Plaintiffs-Appellants,*

*v.*

PAYDAY FINANCIAL, LLC, ET AL.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-09288 — **Charles P. Kocoras**, *Judge.*

---

ARGUED JANUARY 22, 2013 — DECIDED AUGUST 22, 2014

---

Before RIPPLE and ROVNER, *Circuit Judges*, and BARKER, *District Judge.*[*]

RIPPLE, *Circuit Judge.* Deborah Jackson, Linda Gonnella, and James Binkowski (collectively "the Plaintiffs") initially brought this action in Illinois state court against Payday Financial, LLC,

---

[*] The Honorable Sarah Evans Barker, of the United States District Court for the Southern District of Indiana, sitting by designation.

and other defendant entities owned by, or doing business with, Martin A. Webb, an enrolled member of the Cheyenne River Sioux Tribe and also a named defendant (collectively "the Loan Entities" or "the Defendants"). The Plaintiffs alleged violations of Illinois civil and criminal statutes related to loans that they had received from the Loan Entities. After the Loan Entities removed the case to the district court, that court granted the Loan Entities' motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). It held that the loan agreements required that all disputes be resolved through arbitration conducted by the Cheyenne River Sioux Tribe on the Cheyenne River Sioux Tribe Reservation, located within the geographic boundaries of South Dakota. The Plaintiffs timely appealed.

Following oral argument, we ordered a limited remand to the district court for further factual findings concerning (1) whether tribal law was readily available to the litigants and (2) whether arbitration under the auspices of the Cheyenne River Sioux Tribe, as set forth in the loan documents, was available to the parties. The district court concluded that, although the tribal law could be ascertained, the arbitral mechanism detailed in the agreement did not exist.

Based on these findings, we now conclude that the Plaintiffs' action should not have been dismissed because the arbitral mechanism specified in the agreement is illusory. We also cannot accept the Loan Entities' alternative argument for upholding the district court's dismissal: that the loan documents require that any litigation be conducted by a tribal court on the Cheyenne River Sioux Tribe Reservation. As the Supreme Court has explained, most recently in *Plains Com-*

*merce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008), tribal courts have a unique, limited jurisdiction that does not extend generally to the regulation of nontribal members whose actions do not implicate the sovereignty of the tribe or the regulation of tribal lands. The Loan Entities have not established a colorable claim of tribal jurisdiction, and, therefore, exhaustion in tribal courts is not required. Accordingly, we cannot uphold the district court's dismissal on this alternative basis.

# I

# BACKGROUND

## A.

The Loan Entities maintain several websites that offer small, high-interest loans to customers. The entire loan transaction is completed online; a potential customer applies for, and agrees to, the loan terms from his computer. Some loan agreements are assigned to CashCall, Inc. ("CashCall"), a California corporation, after they are executed and funds are advanced.

Each plaintiff applied for and received a $2,525 loan through one of the websites belonging to Mr. Webb's entities. Their loan agreements are nearly identical. Each agreement indicates that the plaintiff will pay approximately 139% in interest each year and that a $2,525 loan will cost approximately $8,392. The loan agreements recite that they are "governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the

Cheyenne River Sioux Tribe" and are not subject "to the laws of any state."[1] Under the terms of the agreement, unless the plaintiff opts out within sixty days, any disputes arising from the agreement "will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement."[2] Arbitration will be conducted by either "(i) a Tribal Elder, or (ii) a panel of three (3) members of the Tribal Council."[3] The loan agreements further provide that the Loan Entities will pay the filing fee and any fees charged by the arbitrator; the loan consumer does not have to travel to the reservation for arbitration; and the loan consumer may participate in arbitration by phone or videoconference. The agreements with Ms. Jackson and Mr. Binkowski also provide that the contract "is subject solely to the exclusive laws *and jurisdiction* of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation."[4] Ms. Gonnella's agreement does not contain similar language.

---

[1] R.14-1 at 2; *see also id.* at 2 ("By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.").

[2] *Id.* at 5.

[3] *Id.*

[4] *Id.* at 2 (emphasis added) (bolding in original omitted); *see also* R.14-8 at 23.

The Plaintiffs executed their loan agreements in 2010 and 2011, received loan funds and made payments on the loans. The record does not indicate whether any of the Plaintiffs have defaulted on the loans.

**B.**

The Plaintiffs initially brought this action in Illinois state court and alleged violations of Illinois civil and criminal usury statutes as well as the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. They sought, among other relief, restitution, statutory damages, litigation costs, an injunction precluding the Loan Entities from further lending to Illinois residents, and a declaration that the arbitration clauses contained in the loan agreements are not enforceable. The Loan Entities removed the action to federal court; they then moved to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3) on the ground that the agreements required arbitration on the reservation. In reply, the Plaintiffs submitted that the agreements were void and thus the arbitration clauses were unenforceable. They additionally had argued that they executed the loan agreements under duress and that Illinois public policy precluded enforcement of the arbitration clause.

The district court dismissed the case for improper venue. It determined that (1) "the alleged illegality of the Loan Agreements has no bearing on the validity of the forum selection clause"; (2) the Plaintiffs' agreement to arbitrate was not made under duress; and (3) the Plaintiffs failed to show "that Illinois' strong public policy in favor of enforcing its usury and

consumer protection laws precludes enforcement of the forum selection provision."[5]

The Plaintiffs timely appealed. After oral argument, we determined that several factual matters critical to our resolution of the issues on appeal should be addressed in the first instance by the district court:

> 1.  Whether the Cheyenne River Sioux Tribe has applicable tribal law readily available to the public and, if so, under what conditions; and

> 2.  Whether the Cheyenne River Sioux Tribe has an authorized arbitration mechanism available to the parties and whether the arbitrator and method of arbitration required under the contract is actually available.[6]

In the subsequent proceedings before the district court, the parties submitted arguments and documentary evidence in support of their respective positions. After considering this evidence, the district court found that the first inquiry could be answered in the affirmative. The court observed that "[e]ach party was able to secure a copy of the Tribal Law" and therefore concluded that "the law c[ould] be acquired by reasonable means."[7] Addressing our second inquiry, the district court concluded that "[i]t is abundantly clear that, on the present

---

[5] R.65 at 6, 7.

[6] R.95 at 1.

[7] *Id.* at 2.

record, the answer to the second question is a resounding no."[8]
The court noted that, other than its disagreement with the
Plaintiffs as to the availability of tribal law, the Plaintiffs'
submission had "fairly describe[d] what the facts show";[9]
included within that submission was the statement that
"[t]ribal leadership … have virtually no experience in handling
claims made against defendants through private arbitration."[10]
According to the court, "[t]he intrusion of the Cheyenne River
Sioux Tribal Nation into the contractual arbitration provision
appear[ed] to be merely an attempt to escape otherwise
applicable limits on interest charges. As such, the promise of
a meaningful and fairly conducted arbitration [wa]s a sham
and an illusion."[11]

In reaching its conclusion, the district court examined the
manner in which an arbitrator had been selected in a similar

---

[8]  *Id.* at 5–6.

[9]  *Id.* at 6.

[10]  R.82 at 8. Although appearing in the Plaintiffs' statement of relevant
facts, the documentation supporting this statement actually was supplied
by the Loan Entities. The Loan Entities submitted a letter from a Media-
tor/Magistrate of the Cheyenne River Sioux Tribe stating that "the
governing authority does not authorize Arbitration," R.83-5 at 2 (Statement
of Magistrate Mona R. Demery, Cheyenne River Sioux Tribal Court), and
a later, clarifying statement from the same individual stating that
"[a]rbitration, as in a contractual agreement, is permissible. However, the
Court does not involve itself in the hiring of the arbitrator or setting dates
or times for the parties." R.83-7 at 2.

[11]  R.95 at 6.

dispute being litigated in the United States District Court for the Southern District of Florida. *See Inetianbor v. CashCall, Inc.*, 962 F. Supp. 2d 1303 (S.D. Fla. 2013). The district court observed:

> The arbitrator selected in the *Inetianbor* case was Robert Chasing Hawk, a Tribal Elder. He was personally selected by Martin Webb, the man who owns and operates the Webb entities which are run as a common enterprise. Mr. Webb is himself a member of the Tribe. Although denying any preexisting relationship with either party in the case, Robert Chasing Hawk is the father of Shannon Chasing Hawk. Robert Chasing Hawk has acknowledged that his daughter worked for one of the companies run by Martin Webb.

> Mr. Chasing Hawk is not an attorney and has not been admitted to the practice of law either in South Dakota or the court of the Cheyenne River Sioux Tribal Nation. He has not had any training as an arbitrator and the sole basis of his selection was because he was a Tribal Elder.

> Black's Law Dictionary, DeLuxe Fourth Edition, defines "arbitrator" as "a private, disinterested person, chosen by the parties to a disputed question, for the purpose of hearing their contention, and giving judgment between them; to whose decision (award) the litigants submit themselves either voluntarily, or, in some cases, compulsorily by order of a court." Freedom from bias and prejudice is a

stated criteria of the American Arbitration Association's Criteria to serve as an arbitrator. Similar is JAM's Arbitrators Ethics Guidelines which require[] freedom from any appearance of a conflict of interest. Illinois Supreme Court Rule 62 states, in part, that "a judge should respect and comply with the law and should conduct himself or herself at all time[s] in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A judge should not allow the judge's family, social or other relationships to influence the judge's judicial conduct or judgment." It should be no less for an arbitrator.

The selection of Robert Chasing Hawk as the arbitrator in the only comparable case is instructive. No arbitration award could ever stand in the instant case if an arbitrator was similarly selected, nor could it satisfy the concept of a "method of arbitration" available to both parties. The selection of Chasing Hawk in the *Inetianbor* case was a purely subjective selection by only one of the parties to the arbitration. The process was not "methodized" in any reasonable sense of the word. Webb and Chasing Hawk are members of the same tribe. The Plaintiffs are not. The employment by Webb of the arbitrator's daughter cannot be ignored. The conduct permitted by the arbitration provisions in this

case could never satisfy the straightforward defini-
tion in Black's Law Dictionary.[12]

The parties submitted supplemental briefs in response to
the district court's findings.[13]

## II

## DISCUSSION

### A.

We now turn to the merits of the Plaintiffs' appeal and
begin by examining our jurisdiction and the applicable
standard of review.

### 1.

The jurisdiction of the district court was premised on the
Class Action Fairness Act. *See* 28 U.S.C. § 1332(d). Under the
terms of that statute,

> The district courts shall have original jurisdiction
> of any civil action in which the matter in controversy

---

[12]  R.95 at 3–4.

[13]  At our invitation, the Federal Trade Commission and the Attorney
General of Illinois submitted briefs as amici curiae. *See* Brief for the Federal
Trade Commission as Amicus Curiae [hereinafter FTC Br.]; Brief for the
Illinois Attorney General as Amicus Curiae Supporting Appellants
[hereinafter Illinois Att'y Gen. Br.]. The court deeply appreciates their
assistance in this matter.

exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

*Id.* § 1332(d)(2). Another provision of the Act forbids a district court from exercising jurisdiction if the plaintiff class numbers less than one hundred. *See id.* § 1332(d)(5).

In this putative class action, the Plaintiffs are all citizens of Illinois who have borrowed money at usurious rates from the Loan Entities. According to the Loan Entities' removal papers, they have made loans to over one hundred individuals in Illinois.

Turning to the requirements for the Defendants, Mr. Webb is an enrolled member of the Cheyenne River Sioux Tribe and resides on its reservation. Mr. Webb is the sole member of the majority of the named entities.[14] Mr. Webb's entities are all

---

[14] The named defendants that belong to Mr. Webb are: Payday Financial, LLC; Western Sky Financial, LLC; Great Sky Finance, LLC; Red Stone Financial, LLC; Management Systems, LLC; 24-7 Cash Direct, LLC; Red River Ventures, LLC; High Country Ventures, LLC; and Financial Solutions, LLC.

limited liability companies organized under the laws of South Dakota[15] and have the same business address in Timber Lake, South Dakota, which is within the reservation. Defendant CashCall is a California corporation that purchases loans from Mr. Webb's companies, but is otherwise unconnected to Mr. Webb.

The threshold amount in controversy also is met. In an affidavit submitted with the Loan Entities' removal papers, Mr. Webb states that he "ha[s] knowledge of and ready access to the business records of the [Loan Entities]" and that he examined the data from those records.[16] According to Mr. Webb's review of those records, there were "substantially more than 100 individuals" making up the putative class and "the total of all amounts collected from putative class members

---

[15] The loan agreements state that Western Sky Financial is "authorized by the laws of the Cheyenne River Sioux Tribal Nation." R.14-1 at 2. In their removal papers, however, the Defendants state that the Loan Entities "were all formed under the laws of South Dakota." R.1 at 4, ¶10. Similarly, the Plaintiffs' jurisdictional statement asserts that the lenders controlled by Mr. Webb "are chartered under South Dakota law as limited liability companies" and "are South Dakota Citizens," Appellants' Br. 1–2; for their part, the Defendants agreed that the Plaintiffs' jurisdictional statement was "complete and correct," Appellees' Br. 1.

[16] R.1-1 at 2, ¶5. Our case law requires that the removing defendant, as the proponent of jurisdiction, show "by a preponderance of the evidence facts that suggest the amount-in-controversy requirement is met." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006). Here, Mr. Webb's statement is based both on personal knowledge and also on his review of the applicable records. This evidence is not contested by the Plaintiffs.

and cancellation of all outstanding balances for these same individuals significantly exceeds $5,000,000."[17]

Our appellate jurisdiction is premised upon 28 U.S.C. § 1291, which gives us jurisdiction over the final decisions of the district courts. It is clear that the decision of the district court granting the Defendants' motion to dismiss for improper venue was a final decision of that court. *Brady v. Sullivan*, 893 F.2d 872, 876 n.8 (7th Cir. 1989) ("[W]hen the dismissal is for want of jurisdiction, either of the person or subject matter, or because of improper venue, the judgment is final and may be appealed." (internal quotation marks omitted)).

**2.**

The loan agreements' forum selection clause was the basis for the district court's dismissal for improper venue.[18] An agreement to arbitrate is a type of forum selection clause. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 630–31 (1985) (treating an arbitration clause in an international agreement as it would other "freely negotiated contractual choice-of-forum provisions"); *Sherwood v. Marquette Transp. Co.*, 587 F.3d 841, 844 (7th Cir. 2009) ("An arbitration agreement is a specialized forum-selection clause.").

---

[17] R.1–1 at 2, ¶7.

[18] The loan agreements require that all "[d]ispute[s] … be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." R.14-1 at 5.

The parties agree that our review of the enforceability of a forum selection clause is de novo. *See Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603, 607 (7th Cir. 2003). They disagree, however, as to whether the Plaintiffs are entitled to inferences in their favor. In *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 806 (7th Cir. 2011), we stated that in reviewing a district court's grant of a Rule 12(b)(3) motion, reasonable inferences from the facts should be construed in the plaintiffs' favor. This approach is consistent with that of other courts of appeals and commentators.[19]

---

[19] *See Petersen v. Boeing Co.*, 715 F.3d 276, 279 (9th Cir. 2013) (per curiam) (stating that, in reviewing a Rule 12(b)(3) motion, a court "must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the nonmoving party" (internal quotation marks omitted)); *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rules 12(b)(1) and 12(b)(3), viewing all facts in the light most favorable to the non-moving party."); *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 (5th Cir. 2009) ("Our de novo review under either Rule 12(b)(1) or Rule 12(b)(3) requires us to view all the facts in a light most favorable to the plaintiff." (internal quotation marks omitted)); 5B Charles Alan Wright, et al., *Federal Practice & Procedure* § 1352, at 324 (3d ed. 2004).

The Loan Entities argue that *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801 (7th Cir. 2011), is "an outlier" and note that "*Faulkenberg* itself cites *Kochert v. Adagen Med. Int'l, Inc.* for the standard of review, but *Kochert* makes no mention of drawing facts or inferences in any party's favor. 491 F.3d 674, 677 (7th Cir. 2007)." Appellees' Br. 8. We are not persuaded. *Faulkenberg* cites *Kochert* for the proposition that a district court's dismissal under Rule 12(b)(3) is subject to de novo review; the fact that *Kochert* does not mention inferences in the non-moving party's favor does not render *Faulkenberg*'s statement an outlier, as demonstrated by the number of cases from our sister circuits that clearly state this proposition.

## B.

As the Supreme Court noted in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010), the Federal Arbitration Act ("FAA") reflects the overarching principle that arbitration is a matter of contract. As a general rule, courts must "'rigorously enforce'" arbitration agreements according to their terms. *Am. Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309 (2013) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). Having determined that our jurisdiction is secure and having examined the standard of review question, we now turn to an examination of the validity of the forum selection clause, the contractual provision at issue in this case.

## 1.

In addressing this question, we first must identify the law that governs the validity of the arbitration clause, which, as we have noted, is a specialized forum selection clause. Here, the district court's jurisdiction over the Plaintiffs' claims is based on the parties' diversity of citizenship.[20] As a general rule, "[i]n diversity cases, we look to the substantive law of the state in which the district court sits, *Erie R. Co. v. Tompkins*, 304 U.S. 64,

---

[20] The Class Action Fairness Act requires "minimal diversity," *see, e.g.,* 28 U.S.C. § 1332(d)(2)(A) (permitting district courts to exercise jurisdiction over class actions in which "any member of a class of plaintiffs is a citizen of a State different from any defendant"); it therefore does not run afoul of the constitutional diversity requirement, *see State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 531 (1967) ("Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens.").

78 (1938), including choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496–97 (1941)." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) (parallel citations omitted).

When applied to the circumstances here, however, we are without clear guidance from the Supreme Court: It has not yet decided "the *Erie* issue of which law governs when," as here, "a federal court, sitting in diversity, evaluates a forum selection clause in the absence of a controlling federal statute." *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 826 (6th Cir. 2009). At present, the majority of federal circuits hold "that the enforceability of a forum selection clause implicates federal procedure and should therefore be governed by federal law." *Id.* at 827 & n.5 (collecting cases);[21] *see also* 14D Charles Alan Wright, et al., *Federal Practice & Procedure* § 3803.1, at 107–12 (4th ed. 2014). We have taken a different approach. In *Abbott Laboratories v. Takeda Pharmaceutical Co.*, 476 F.3d 421 (7th Cir. 2007), we stated:

---

[21] *See, e.g.*, *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) ("We apply federal law to the interpretation of the forum selection clause."); *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007) ("[T]he rule set out in *M/S Bremen* [*v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972),] applies to the question of enforceability of an apparently governing forum selection clause, irrespective of whether a claim arises under federal or state law."); *P & S Bus. Machs. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) ("Consideration of whether to enforce a forum selection clause in diversity suit is governed by federal law … ."). Most of these cases rest, at bottom, on the premise that "[q]uestions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature." *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1990).

>    Simplicity argues for determining the validity and meaning of a forum selection clause, in a case in which interests other than those of the parties will not be significantly affected by the choice of which law is to control, by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears, rather than making the court apply two different bodies of law in the same case.

*Id.* at 423 (citations omitted). In contracts containing a choice of law clause, therefore, the law designated in the choice of law clause would be used to determine the validity of the forum selection clause. *See id.*; *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 991 (7th Cir. 2008) ("*Abbott Laboratories* … held that the validity of a forum-selection clause depends on the law of the jurisdiction whose rules will govern the rest of the dispute.").

Applying the rule in *Abbott Laboratories*, we look to the choice of law clause in the loan agreements, which provides that the agreements are "governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe."[22] Assuming the validity of this choice of law provision,[23] the Defendants have

---

[22] R.14-1 at 4; *see also id.* at 2.

[23] Both the Plaintiffs and the Attorney General of Illinois maintain that the choice of law provision and the forum selection clause work in tandem to create an unconscionable result. *See* Appellants' Br. 13, 25; Illinois Att'y Gen.

(continued…)

[23] (...continued)

Br. 22. We agree that a more-than-colorable argument can be made that the loan agreements' choice of law clause should not be enforced and that Illinois law ought to govern the parties' dispute.

The courts of Illinois will respect a choice of law clause if the contract is valid and if the law chosen is not contrary to Illinois public policy. *Thomas v. Guardsmark*, 381 F.3d 701, 705 (7th Cir. 2004). Here, the Plaintiffs and amici maintain that several provisions of the loan agreements violate Illinois public policy. First, the Attorney General argues that "Illinois has a strong public policy against enforcing provisions requiring plaintiffs to adjudicate claims in a distant, inconvenient forum where, as in this case, the clause is embedded in contracts 'involving unsophisticated consumers in small transactions in the marketplace without any real opportunity to consider [whether to accept the clause].'" Illinois Att'y Gen. Br. 12 (alteration in original) (quoting *IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 394 (Ill. App. Ct. 2007)); *see also infra* pp. 22–26. The Plaintiffs maintain that the contracts violate Illinois public policy against usury because they exceed the allowable interest rate under state law. *See* 815 ILCS 205/4(1) (stating that "in all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest"). Small consumer loans, however, are exempted from this requirement, to the extent that they comply with the State's Consumer Installment Loan Act. *See id.* ("It is lawful to receive or to contract to receive and collect interest and charges as authorized by this Act and as authorized by the Consumer Installment Loan Act … .").

The Defendants seize on this exception and note that, when the Plaintiffs entered into the loan agreements, "Illinois law imposed no cap on the interest rate allowed for small consumer loans," and, when the General Assembly amended the law, it imposed a maximum rate of ninety-nine percent. Reply Brief of Defendants-Appellees to Briefs of Amici Curiae [hereinafter Defendants' Reply Br.] 21. Defendants cannot invoke this exception, however, because they are not licensed providers as required by 205 ILCS 670/1; moreover, they do not maintain that they otherwise have complied with the consumer-protection provisions of the Consumer

(continued...)

informed us in their supplemental briefing that they "have been unable to locate tribal precedent addressing forum selection clauses."[24] In such circumstances, they note, tribal courts borrow from "federal law to stand in or amplify tribal law where necessary."[25] We therefore turn to the federal guidelines for determining the validity of a forum selection clause.

We have held that "[t]he presumptive validity of a forum selection clause can be overcome if the resisting party can show it is 'unreasonable under the circumstances.'" *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). Relying on the Court's decisions in *M/S Bremen* and *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), we have identified three sets of circumstances that will render a forum selection clause "unreasonable":

---

[23] (...continued)

Installment Loan Act, *see, e.g.*, 205 ILCS 670/14 (prohibiting a lender from "pledg[ing], hypothecat[ing] or sell[ing] a note entered into under the provisions of this Act by an obligor except to another licensee under this Act"). The Loan Entities tacitly admit that the licensure requirements may call the contract into question, but maintain that "[w]hether the licensure requirements cited by Plaintiffs apply here must still be decided[ ]in the forum the Parties agreed to." Appellees' Br. 19. n.12. We need not decide the question of what law governs the validity and interpretation of the loan agreements, however, because whether federal, tribal, or Illinois law applies, the same result obtains. *See infra* pp. 19–26.

[24] Defendants' Reply Br. 22.

[25] *Id.* (internal quotation marks omitted).

(1) if their incorporation into the contract was the
result of fraud, undue influence or overweening
bargaining power; (2) if the selected forum is so
"gravely difficult and inconvenient that [the com-
plaining party] will for all practical purposes be
deprived of its day in court[]"; or (3) if enforcement
of the clauses would contravene a strong public
policy of the forum in which the suit is brought,
declared by statute or judicial decision.

*Bonny*, 3 F.3d at 160 (first alteration in original) (citations
omitted) (quoting *M/S Bremen*, 407 U.S. at 18).

Applying this standard, we believe enforcement of the
forum selection clause contained in the loan agreements is
unreasonable. The loan agreements specify that disputes
arising from the agreement "will be resolved by Arbitration,
which shall be conducted by the Cheyenne River Sioux Tribal
Nation by an authorized representative in accordance with its
consumer dispute rules and the terms of this Agreement."[26]
Arbitration will be conducted by "either (i) a Tribal Elder, or
(ii) a panel of three (3) members of the Tribal Council."[27] The
record clearly establishes, however, that such a forum does not
exist: The Cheyenne River Sioux Tribe "does not authorize
Arbitration,"[28] it "does not involve itself in the hiring of …

---

[26] R.14-1 at 5.

[27] *Id.*

[28] R.83-5 at 2.

arbitrator[s],"[29] and it does not have consumer dispute rules.[30] We have no hesitation concluding that an illusory forum is unreasonable under *M/S Bremen*.[31]

---

[29] R.83-7 at 2.

[30] Defendants' Reply Br. 4 ("Nor does it matter that the CRST does not have any 'consumer dispute rules,' which the Agreements presuppose.").

[31] *Cf. BP Marine Ams. v. Geostar Shipping Co. N.V.*, No. 94–2118, 1995 WL 131056, at *4 (E.D. La. Mar. 22, 1995) (applying *M/S Bremen* and refusing to enforce a forum selection clause on the ground that the designated forum, "High Court in New York," did not exist).

In their supplemental submission, the Defendants try to characterize the Illinois Attorney General's amicus brief as stating that "under federal law (and thus tribal) law, the forum selection clause is valid." Defendants' Reply Br. 23. The Defendants misread the Attorney General's submission. In her brief to this court, the Attorney General reviewed our decision in *IFC Credit Corp. v. Aliano Brothers General Contractors*, 437 F.3d 606 (7th Cir. 2006), which noted that

> "Illinois law on validity is more lenient toward the [party challenging the forum selection clause] than the federal law when there is significant inequality of size or commercial sophistication between the parties, especially if the transaction is so small that the unsophisticated party might not be expected to be careful about reading boilerplate provisions that would come into play only in the event of a lawsuit, normally a remote possibility."

Illinois Att'y Gen. Br. 13 (alteration in original) (quoting *IFC Credit Corp.*, 437 F.3d at 611). The Attorney General then proceeds to argue that, under Illinois law, the choice of forum provision is invalid. The Attorney General does not analyze the choice of forum provision under federal law, nor does

(continued...)

If, however, the choice of law provision is invalid,[32] Illinois law would govern the question of the validity of the choice of forum provision. Illinois, like many states, has used *M/S Bremen* and its touchstone concept of reasonableness to evaluate the enforceability of a forum selection clause. *See Calanca v. D & S Mfg. Co.*, 510 N.E.2d 21, 23 (Ill. App. Ct. 1987).

Under Illinois law, "[a] forum selection clause in a contract is *prima facie* valid and should be enforced unless the opposing party shows that enforcement would be unreasonable under the circumstances." *IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 389 (Ill. App. Ct. 2007). This is true, however, only of "agreement[s] reached through arm's-length negotiation between experienced and sophisticated business people"; "a forum selection clause contained in boilerplate language indicates unequal bargaining power, and the significance of the provision is greatly reduced." *Id.*

In an effort to make more concrete the standard of reasonableness articulated in *M/S Bremen*, Illinois courts typically have looked to six factors:

> (1) the law that governs the formation and construction of the contract; (2) the residency of the parties; (3) the place of execution and/or performance of the contract; (4) the location of the parties and their witnesses; (5) the inconvenience to the parties of any

---

[31] (...continued)
she make any predictions about what the outcome of such an analysis might be.

[32] *See supra* note 23.

particular location; and (6) whether the clause was equally bargained for.

*Id.* at 389–90 (citing *Dace Int'l, Inc. v. Apple Computer, Inc.*, 655 N.E.2d 974, 977 (Ill. App. Ct. 1995)). Even assuming that tribal law governs the formation and construction of the contract, another key element weighs against enforcement of the clause, namely that the clause was not the product of equal bargaining: It imposes on unsophisticated consumers a nonexistent forum for resolution of disputes in a location that is remote and inconvenient.

Although helpful in evaluating the mine-run of forum selection clauses that a court may encounter, these criteria are ill-suited for evaluating the forum designated in these particular loan agreements. The factors set forth in *IFC Credit Corp.* presuppose that the designated forum exists and is available to resolve the underlying dispute. Such is not the case here.

We do find helpful, however, the closely allied yet distinct concept of unconscionability. *See Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647 (Ill. 2011). Under Illinois law, a contractual provision may be unconscionable on either procedural or substantive grounds. *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Id.* "Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were

hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co.*, 949 N.E.2d at 647 (internal quotation marks omitted). Substantive unconscionability, by contrast,

> concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. … Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.

*Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006) (internal quotation marks omitted). Like other contractual provisions, forum selection clauses—even those designating arbitral fora—are not immune from the general principle that unconscionable contractual provisions are invalid.[33]

---

[33] *Potiyevskiy v. TM Transp., Inc.*, No. 1-13-1864, 2013 WL 6199949, at *7–10 (Ill. App. Ct. Nov. 25, 2013) (holding that arbitration agreement in employment contract was substantively unconscionable because it required a plaintiff to challenge individually each biweekly pay period during which an allegedly improper deduction occurred, it required arbitration of disputes in Illinois despite an employee's state of residence, and the arbitration fees made claims cost-prohibitive); *Timmerman v. Grain Exch., LLC*, 915 N.E.2d 113, 120 (Ill. App. Ct. 2009) (holding that arbitration provision was procedurally unconscionable where "[t]he contracts themselves made no direct mention of arbitration," and the rules that incorporated the arbitration provision "were not set forth in the contracts, nor had they been provided to or made available to the plaintiffs prior to their entering into the contracts").

The choice of forum provision at issue here is both procedurally and substantively unconscionable. Turning first to procedural unconscionability, although the district court held on remand that the substantive commercial law of the Cheyenne River Sioux Tribe was reasonably ascertainable, it did not reach this conclusion with respect to tribal rules for conducting arbitrations. Indeed, the record establishes that such procedures do not exist. The Tribe has neither a set of procedures for the selection of arbitrators nor one for the conduct of arbitral proceedings. Consequently, it was not possible for the Plaintiffs to ascertain the dispute resolution processes and rules to which they were agreeing. Moreover, even if the described arbitral forum were functional and its rules ascertainable, we agree with the Federal Trade Commission that "[t]he inconsistent language in the loan contracts, specifying both exclusive Tribal Court jurisdiction and exclusive tribal arbitration without reconciling those provisions, also ma[de] it difficult for borrowers to understand exactly what form of dispute resolution they [we]re agreeing to."[34] Finally, the Loan Entities' claims concerning the scope of tribal jurisdiction, as well as their invocation of an irrelevant constitutional provision, "may [have] induce[d] [the Plaintiffs] to believe, mistakenly, that they ha[d] no choice but to accede to resolution of their disputes on the Reservation."[35]

With respect to substantive unconscionability, the dispute-resolution mechanism set forth in the loan

---

[34] FTC Br. 27.

[35] *Id.*

agreements—"conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules"[36]—did not exist. As the district court "resounding[ly]" concluded, there simply was no prospect "of a meaningful and fairly conducted arbitration"; instead, this aspect of the loan agreements "[wa]s a sham and an illusion."[37]

---

[36] R.14-1 at 5.

[37] R.95 at 6. Our conclusion would not change if we were to apply tribal law as opposed to Illinois law, as urged by the Defendants. According to the Defendants, the courts of the Cheyenne River Sioux Tribe would employ "'traditional contractual principles,' including the Restatement," to determine if the forum selection provision were unconscionable. Defendants' Reply Br. 9. They explain that the Restatement, unlike Illinois law, requires a showing of *both* procedural and substantive unconscionability. However, as we already have demonstrated, the forum selection clause here is both substantively and procedurally unconscionable.

We note that other courts have refused to honor agreements to arbitrate, where the rules are inherently biased or are not formulated in good faith. *See, e.g.*, *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) ("By creating a sham system unworthy even of the name of arbitration, Hooters completely failed in performing its contractual duty."). Indeed, we have refused to enforce an arbitration agreement where the obligation was so one-sided as to make any genuine obligation illusory. *Cf. Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 756, 758–61 (7th Cir. 2001) (observing that the agreement to arbitrate is "hopelessly vague and uncertain as to the obligation EDS has undertaken" and concluding that, "[f]or all practical purposes, *EDS's promise under this contract makes performance entirely optional with the promisor*" (emphasis added) (internal quotation marks omitted)).

**2.**

The Loan Entities nevertheless maintain that these state-law-based shortcomings are irrelevant because Section 2 of the Federal Arbitration Act "preempts arbitrator bias defenses because such defenses are not applicable to all contracts."[38] They point out that section 2 of the FAA provides that arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). They then submit that, because arbitrator bias is a "defense[] that appl[ies] *only* to arbitration or that derive[s] [its] meaning from the fact that an agreement to arbitrate is at issue," *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011) (emphasis added), it is not applicable to "any contract" and is therefore preempted.

We cannot accept this argument. The arbitration clause here is void not simply because of a strong possibility of arbitrator bias, but because it provides that a decision is to be made under a process that is a sham from stem to stern. Although the contract language contemplates a process conducted under the watchful eye of a legitimate governing tribal body, a proceeding subject to such oversight simply is not a possibility. The arbitrator is chosen in a manner to ensure partiality, but, beyond this infirmity, the Tribe has *no rules* for the conduct of the procedure. It hardly frustrates FAA provisions to void an arbitration clause on the ground that it contemplates a proceeding for which the entity responsible for conducting the proceeding has no rules, guidelines, or guarantees of fairness.

---

[38] Defendants' Reply Br. 5.

*See Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) ("By creating a sham system unworthy even of the name of arbitration, Hooters completely failed in performing its contractual duty."); *cf. Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 756, 758–61 (7th Cir. 2001) (refusing to enforce an arbitration clause that is "hopelessly vague and uncertain as to the obligation EDS has undertaken" because it, "[f]or all practical purposes, … makes performance entirely optional with the promisor" (internal quotation marks omitted)).[39]

---

[39] The Loan Entities also make the claim that, "[b]ecause Illinois enforces adhesion contracts despite unconscionability claims, it may not use [the] unconscionability doctrine to void arbitration provisions in those contracts." Defendants Reply Br. 6 (citing *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366–67 (7th Cir. 1999)). *Koveleskie* does not support such a sweeping conclusion. In *Koveleskie*, we commented that Illinois courts do not consider disparity of bargaining power, standing alone, as a reason to invalidate contracts. Consequently, "the disparity in the size of the parties entering into the agreement … without some wrongful use of that power, is not enough to render an arbitration agreement unenforceable." 167 F.3d at 367 (alteration in original) (internal quotation marks omitted). Here, as we have discussed, the Loan Entities used the disparity in bargaining power to impose on the Plaintiffs a dispute-resolution mechanism that does not exist.

We also cannot accept the Loan Entities' suggestion that the FAA preempts Illinois's rules on unconscionability with respect to the forum selection clause because they have a "'disproportionate impact on arbitration agreements.'" Defendants' Reply Br. 16 (quoting *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747 (2011)). According to the Loan Entities, subjecting arbitration agreements to unconscionability rules for forum selection clauses "would give States free rein to gut the FAA by labeling their policy applicable to 'forum selection clauses' rather than arbitration provisions." *Id.* at 17. However, because the Supreme Court has

(continued...)

The Loan Entities also contend that section 5 of the FAA prevents our voiding the arbitration clause. That section provides, in relevant part, that, "if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators[,] … the court shall designate and appoint an arbitrator or arbitrators … who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein." 9 U.S.C. § 5.

Like the Loan Entities' earlier argument, this submission assumes that the arbitration provision's only infirmity is the disability of a particular arbitrator or class of arbitrators. Here, however, the likelihood of a biased arbitrator is but the tip of the iceberg. Although the arbitration provision contemplates the involvement and supervision of the Cheyenne River Sioux Tribe, the record establishes that the Tribe does not undertake such activity. Furthermore, there are no rules in place for such an arbitration. Under these circumstances, the court cannot save the arbitral process simply by substituting an arbitrator.

This case is therefore distinctly different from the situation that we faced in *Green v. U.S. Cash Advance Illinois, LLC*, 724 F.3d 787 (7th Cir. 2013). In *Green*, a lender moved to dismiss a

---

[39] (...continued)

treated arbitration provisions as forum selection provisions, *see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 630–31 (1985) (treating an arbitration clause in an international agreement as it would other "freely negotiated contractual choice-of-forum provisions"), we perceive no impediments in allowing states to apply their generally applicable unconscionability rules to arbitration provisions in the same manner they would apply those rules to clauses designating non-arbitral fora.

plaintiff's claims under the Truth in Lending Act on the ground that the lending contract required submission of disputes to "arbitration by one arbitrator by and under the Code of Procedure of the National Arbitration Forum." *Id.* at 788 (internal quotation marks omitted). The National Arbitration Forum, however, had stopped taking consumer cases for arbitrations. The district court, therefore, denied the motion to dismiss on the ground that "the identity of the Forum as the arbitrator [wa]s 'an integral part of the agreement'" and that the arbitration provision was therefore void. *Id.* at 789. We reversed. We noted that the language of the agreement called for the arbitration to be conducted in accordance with the National Arbitration Forum's procedures, not necessarily under its direct auspices. The district court, therefore, could invoke section 5 of the FAA to appoint an arbitrator, who then could "resolve this dispute using the procedures in the National Arbitration Forum's Code of Procedure." *Id.* at 793.

In *Green*, we noted that, if the particular arbitration clause before us had been shorn of all detail as to the number of arbitrators, the identity of the arbitrators or the rules that the arbitrators were to employ, the mere existence of the arbitration clause would have made it clear that the parties still would have preferred to submit their dispute to arbitration. *Id*. at 792–93.

Although such mutuality of intent might have been apparent in the contractual relationship in *Green*, it is not at all apparent in the situation before us today. The contract at issue here contains a very atypical and carefully crafted arbitration clause designed to lull the loan consumer into believing that, although any dispute would be subject to an arbitration

proceeding in a distant forum, that proceeding nevertheless would be under the aegis of a public body and conducted under procedural rules approved by that body. The parties *might* have chosen arbitration even if they could not have had the arbitrator whom they had specified or even if the rules to which they had stipulated were not available. But even if these circumstances had been tolerable, a far more basic infirmity would have remained: One party, namely the loan consumer, would have been left without a basic protection and essential part of his bargain—the auspices of a public entity of tribal governance. The loan consumers did not agree to arbitration under any and all circumstances, but only to arbitration under carefully controlled circumstances—circumstances that never existed and for which a substitute cannot be constructed.

In sum, the arbitration clause is both procedurally and substantively unconscionable under Illinois law. It is procedurally unconscionable because the Plaintiffs could not have ascertained or understood the arbitration procedure to which they were agreeing because it did not exist. It is substantively unconscionable because it allowed the Loan Entities to manipulate what purported to be a fair arbitration process by selecting an arbitrator and proceeding according to nonexistent rules. It is clearly "unreasonable" under the standard articulated in *M/S Bremen*. Under such circumstances, the FAA does not preempt state law, nor does it operate to permit the creation, from scratch, of an alternate arbitral mechanism.

## C.

Having concluded that the arbitration clause contained in the loan agreements is unenforceable, we now turn to the Loan Entities' alternative argument for affirmance—that the agreements' forum selection clause requires any litigation to be conducted in the *courts* of the Cheyenne River Sioux Tribe.

## 1.

"[T]he inherent sovereign powers of an Indian[40] tribe do not extend to the activities of nonmembers of the tribe." *Montana v. United States*, 450 U.S. 544, 565 (1981). Nevertheless, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Id.* Recognizing this limited right, the Court in *Montana* articulated two narrow situations in which a tribe may exercise jurisdiction over nonmembers: (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at

---

[40] Throughout this opinion, we use the term "Indian" rather than "Native American," reflecting the fact that both tradition, governing statutes, and cases follow that practice.

565, 566. The Loan Entities maintain that the tribal courts have jurisdiction over the present dispute under the first exception.

The Loan Entities have not met their burden of establishing tribal court jurisdiction over the Plaintiffs' claims.[41] We begin with the Supreme Court's initial observation in *Montana* that tribal court jurisdiction over non-Indians is limited: "Indian tribes retain inherent sovereign power to exercise *some* forms of civil jurisdiction *over non-Indians on their reservations*, even on non-Indian fee lands." *Id.* at 565 (emphasis added). "[A] tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction"; therefore, if a tribe does not have the authority to regulate an activity, the tribal court similarly lacks jurisdiction to hear a claim based on that activity. *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008) (internal quotation marks omitted).

In *Plains Commerce Bank*, the Court explicitly noted that the nature of tribal court authority over non-Indians is circumscribed: "We have frequently noted, however, that the sovereignty that the Indian tribes retain is of a unique and limited character. *It centers on the land held by the tribe and on the tribal members within the reservation*." *Id.* at 327 (emphasis added) (citation omitted) (internal quotation marks omitted). In short, "*Montana* and its progeny permit tribal regulation of nonmem-

---

[41] *Cf. Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of the Miss. in Iowa*, 609 F.3d 927, 936 (8th Cir. 2010) ("Because 'efforts by a tribe to regulate nonmembers … are presumptively invalid,' the Tribe bears the burden of showing that its assertion of jurisdiction falls within one of the *Montana* exceptions." (alteration in original) (quoting *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008))).

ber *conduct inside the reservation* that implicates the tribe's sovereign interests." *Id.* at 332 (additional emphasis added).

Here, the Plaintiffs have not engaged in *any* activities inside the reservation. They did not enter the reservation to apply for the loans, negotiate the loans, or execute loan documents. They applied for loans in Illinois by accessing a website. They made payments on the loans and paid the financing charges from Illinois. Because the Plaintiffs' activities do not implicate the sovereignty of the tribe over its land and its concomitant authority to regulate the activity of nonmembers on that land, the tribal courts do not have jurisdiction over the Plaintiffs' claims.[42]

**2.**

We also are unpersuaded by the Defendants' argument that the Plaintiffs "consented to tribal jurisdiction." Appellees' Br. 37. As the Court has noted on more than one occasion, tribal

---

[42] Because we rest our determination of tribal court jurisdiction on this basis, we need not consider whether any of the Loan Entities would be considered a member of the tribe for purposes of the first *Montana* exception. *See* Appellees' Br. 31.

We also note that, at several places in their submissions, the Loan Entities suggest that the dispute concerns "on reservation" activities because that is where Western Sky executed the contracts. *See, e.g.,* Appellees' Br. 36; Defendants' Reply Br. 24. The question of a tribal court's *subject matter jurisdiction* over a nonmember, however, is tethered to the *nonmember's* actions, specifically the *nonmember's actions on the tribal land*. There simply is no allegation here that the dispute involves activities of the Plaintiffs on the reservation.

courts are not courts of general jurisdiction. *See Nevada v. Hicks*, 533 U.S. 353, 367 (2001). Moreover, a tribal court's authority to adjudicate claims involving nonmembers concerns its subject matter jurisdiction, not personal jurisdiction. *See id.* n.8. Therefore, a nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court. As the Court explained in *Plains Commerce Bank*:

> Tribal sovereignty, it should be remembered, is a sovereignty outside the basic structure of the Constitution. The Bill of Rights does not apply to Indian tribes. Indian courts differ from traditional American courts in a number of significant respects. And nonmembers have no part in tribal government—they have no say in the laws and regulations that govern tribal territory. Consequently, those laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. *Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations*.

554 U.S. at 337 (emphasis added) (citations omitted) (internal quotation marks omitted). The Loan Entities, however, have made no showing that the present dispute implicates *any* aspect of "the tribe's inherent sovereign authority."[43]

---

[43] *Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians*, 746 F.3d 167 (5th Cir. 2014), is not to the contrary. *Dolgencorp* concerned the tribal court's

(continued...)

**3.**

The Loan Entities maintain, however, that the doctrine of tribal exhaustion requires that the issue of jurisdiction be decided, in the first instance, by a tribal court. The concept of

---

[43] (...continued)
authority over tort claims brought by a thirteen-year-old tribal member against the corporate owner of a Dollar General store located on reservation land. The tribal member was participating in a tribe-operated job training program at the store when he was sexually molested by the store manager. The tribal member sued Dolgencorp in tribal court and alleged that the corporation was vicariously liable for the manager's actions and that it negligently had hired, trained, or supervised the manager. Dolgencorp unsuccessfully sought an injunction against the tribal action in federal district court. In holding that the tribal court had jurisdiction over these claims, the Fifth Circuit rejected Dolgencorp's argument "that *Plains Commerce* narrowed the *Montana* consensual relationship exception, allowing tribes to regulate consensual relationships with nonmembers only upon a showing that the *specific* relationships 'implicate tribal governance and internal relations.'" *Id.* at 174 (emphasis added) (quoting *Plains Commerce Bank*, 554 U.S. at 334–35). It stated:

> It is hard to imagine how a single employment relationship between a tribe member and a business could ever have such an impact. On the other hand, at a higher level of generality, the ability to regulate the working conditions (particularly as pertains to health and safety) of tribe members employed on reservation land is plainly central to the tribe's power of self-government. Nothing in *Plains Commerce* requires a focus on the highly specific rather than the general.

*Id.* at 175. In the present situation, there is no equivalent tribal concern that satisfied the requirement of *Plains Commerce Bank*.

federal court abstention in cases involving Indian tribes known as the "tribal exhaustion rule" generally "requires that federal courts abstain from hearing certain claims relating to Indian tribes until the plaintiff has first exhausted those claims in a tribal court." *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 79 (2d Cir. 2001). It is not at all clear, however, that the doctrine of tribal exhaustion requires a federal court to abstain from exercising jurisdiction when that exercise will not interfere with a pending tribal court action. *See Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 814 (7th Cir. 1993) ("It is unclear as to how broadly *Iowa Mutual* [*Insurance Co. v. LaPlante*, 480 U.S. 9 (1987),] and *National Farmers* [*Union Insurance Cos. v. Crow Tribe of Indians,* 471 U.S. 845 (1985),] should be read. … [T]he two Supreme Court cases dealt only with the situation where a tribal court's jurisdiction over a dispute has been challenged by a later-filed action in federal court.").[44] Even assuming that the

---

[44] The courts of appeals that have addressed the issue have reached opposite conclusions. In *Garcia v. Akwesasne Housing Authority*, 268 F.3d 76, 80 (2d Cir. 2001), the Court of Appeals for the Second Circuit held that tribal exhaustion was not required absent an ongoing tribal proceeding. It explained its rationale accordingly:

This Court and the Supreme Court have required abstention under the tribal exhaustion rule on just three occasions: [*Iowa Mutual Insurance Co. v.*] *LaPlante*, 480 U.S. [9,] 14–20[ (1987)]; *National Farmers* [*Union Insurance Companies v. Crow Tribe of Indians*], 471 U.S. [845, ]853–56 [(1985)]; and *Basil Cook Enters. v. St. Regis Mohawk Tribe,* 117 F.3d 61 (2d Cir. 1997). In each instance, the plaintiff was litigating a previously-filed, ongoing tribal court action, and was asking the federal court to interfere with those

(continued...)

tribal exhaustion doctrine applies where there are no pending tribal court proceedings,[45] we do not believe that exhaustion is required in this case.

The Loan Entities argue that, "[t]o trigger the tribal exhaustion rule, only a 'colorable' claim of tribal subject matter jurisdiction need be asserted."[46] Even a cursory look at the cases on which the Loan Entities rely, however, reveals that the assertion of tribal jurisdiction here is not "colorable."

---

[44] (...continued)

> tribal proceedings. These cases are procedurally distinguishable from Garcia's case because Garcia's claims have not been in tribal court. We conclude that the reasoning of these cases and the policy considerations that underlie them militate in favor of the opposite result in this case: the comity and deference owed to a tribal court that is adjudicating an intra-tribal dispute under tribal law does not compel abstention by a federal court where a non-member asserts state and federal claims and nothing is pending in the tribal court.

*Id.* (parallel citations omitted). *But see, e.g.*, *United States v. Plainbull*, 957 F.2d 724, 728 (9th Cir. 1992) (rejecting the Government's argument that "the district court abused its discretion by abstaining from the merits of this case because there was no concurrent action pending in the tribal courts" because "[w]hether a tribal action is pending, however, does not determine whether abstention is appropriate").

[45] Neither party addressed the issue whether the tribal exhaustion doctrine applies in the absence of a pending tribal proceeding.

[46] Appellees' Br. 28 (citing *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 33 (1st Cir. 2000), and *Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842 (9th Cir. 2009)).

In *Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority*, 207 F.3d 21, 33 (1st Cir. 2000), a case decided before *Plains Commerce Bank*, a dispute had arisen between a tribal entity, the Narragansett Indian Wetuomuck Housing Authority, and the Ninigret Development Corporation (a Rhode Island corporation in which a member of the Tribe was a principal) concerning the construction of a low-income, off-reservation housing development for tribal members. On appeal from the district court's dismissal of the development company's action, the court addressed whether the doctrine of tribal exhaustion applied. After reviewing the policy considerations underlying this "prudential doctrine," the court observed that "the tribal exhaustion doctrine d[id] not apply mechanistically to every claim brought by or against an Indian tribe" and that "scope-related" objections to exhaustion could be raised. *Id.* at 31–32. The court explained that, although "activities of non-Indians *on reservation lands* almost always require exhaustion *if they involve the tribe*," where the "dispute arises out of activities conducted elsewhere[,] … an inquiring court must make a particularized examination of the facts and circumstances attendant to the dispute in order to determine whether comity suggests a need for exhaustion of tribal remedies as a precursor to federal court adjudication." *Id.* at 32 (emphasis added). "'[O]ff-the-reservation'" conduct, the court observed, "*must at a bare minimum impact directly upon tribal affairs*" in order to trigger the exhaustion requirement. *Id.* (emphasis added). In *Ninigret*, the court determined that this requirement had been met because "Ninigret's dealings with the Authority bore directly on the use and disposition of tribal resources (land and money)." *Id.* Here, the Loan Entities do not

posit any way in which the present dispute "impact[s] directly upon tribal affairs." *Id.*[47] There has been no showing that the present dispute involves questions of tribal self-governance or use of tribal resources in the manner present in *Ninigret*.

*Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842 (9th Cir. 2009), is equally unhelpful to the Loan Entities in establishing a "colorable" claim of tribal court authority. *Elliott* concerned an action brought by the White Mountain Apache Tribe against a non-Indian, who had gotten lost *on reservation lands*. In an effort to attract attention, Elliott had set a signal fire, which grew into a substantial forest fire, burned over 400,000 acres, and caused millions of dollars in damage. The tribe brought suit in tribal court for damages, "alleging violations of tribal executive orders, the tribal game and fish code, the tribal natural resource code, and common law negligence and trespass." *Id.* at 845. The Ninth Circuit agreed with the tribe that this scenario raised a colorable claim of tribal jurisdiction:

> The tribe seeks to enforce its regulations that prohibit, among other things, trespassing onto tribal lands, setting a fire without a permit on tribal lands, and destroying natural resources on tribal lands. The Supreme Court has strongly suggested that a tribe may regulate nonmembers' conduct on tribal

---

[47]   The Loan Entities do argue that "the Tribe has an interest in claims against a local, member-owned business for its on-Reservation conduct." Appellees' Br. 30. It goes without saying that a dispute in which the tribe takes an "interest," *id.*, is markedly different from a dispute which "impact[s] directly upon tribal affairs," *Ninigret*, 207 F.3d at 32.

> lands *to the extent that the tribe can "'assert a land-*
> *owner's right to occupy and exclude.'"* The tribal
> regulations at issue stem from the tribe's "land-
> owner's right to occupy and exclude."

*Id.* at 849–50 (emphasis added) (citations omitted) (quoting *Hicks*, 533 U.S. at 359). Again, the Loan Entities have asserted nothing akin to the Tribe's right, as a landowner, "to occupy and exclude."[48]

The present dispute does not arise from the actions of nonmembers on reservation land and does not otherwise raise issues of tribal integrity, sovereignty, self-government, or allocation of resources. There simply is no colorable claim that the courts of the Cheyenne River Sioux Tribe can exercise jurisdiction over the Plaintiffs. Tribal exhaustion, therefore, is not required.

## Conclusion

The arbitration provision contained in the loan agreements is unreasonable and substantively and procedurally unconscionable under federal, state, and tribal law. The district court,

---

[48] Indeed, the other cases relied upon by the Loan Entities for the proposition that tribal exhaustion is required concern regulation of, or actions on, tribal land. *See, e.g., Iowa Mut. Ins.* Co., 480 U.S. at 11 (concerning insurance company's liability to a tribe-owned business and its tribe-member employee for injuries sustained on the reservation); *Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold*, 27 F.3d 1294, 1295 (8th Cir. 1994) (concerning tribal court's authority over a dispute involving tribal taxation of commercial property on reservation land and tribal regulation of employment on reservation land).

therefore, erred in granting the Defendants' motion to dismiss for improper venue based on that provision. Additionally, the courts of the Cheyenne River Sioux Tribe do not have subject matter jurisdiction over the Plaintiffs' claims. Nor have the Defendants raised a colorable claim of tribal jurisdiction necessary to invoke the rule of tribal exhaustion. The district court's dismissal, therefore, cannot be upheld on the alternative basis that this dispute belongs in tribal court. We therefore reverse the judgment of the district court granting the Defendants' motion to dismiss and remand for further proceedings consistent with this opinion. The Plaintiffs may recover their costs in this court.

REVERSED and REMANDED