In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1469
UNITED NATURAL FOODS, INC., et al.,
 Plaintiffs-Appellees,
 v.

TEAMSTERS LOCAL 414,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Indiana, Fort Wayne Division.
 No. 1:21-cv-00020-HAB-SLC — Holly A. Brady, Judge.
 ____________________

 ARGUED SEPTEMBER 29, 2022 — DECIDED JANUARY 31, 2023
 ____________________

 Before SYKES, Chief Judge, and ROVNER and JACKSON-
AKIWUMI, Circuit Judges.
 ROVNER, Circuit Judge. United Natural Foods, Inc., and its
corporate affiliates filed suit against Teamsters Local 414 con-
tending that the Local breached its collective bargaining
agreement with the company by initiating two strikes at
United Natural’s Fort Wayne, Indiana distribution center. The
question presented in this appeal is whether United Natural
is compelled by the grievance and arbitration provisions of
2 No. 22-1469

the collective bargaining agreement to arbitrate this claim. We
agree with the district court that it is not. See United Natural
Foods, Inc. v. Teamsters Local 414, 2022 WL 767165 (N.D. Ind.
Mar. 14, 2022).
 I.
 We take the following facts from United Natural’s com-
plaint. For present purposes, these facts are not disputed, and
Local 414 has included them in its own account of the under-
lying circumstances.
 United Natural and Local 414 were parties to a collective
bargaining agreement (the “agreement” or “CBA”) effective
from June 2017 to September 2019, covering certain employ-
ees working at United Natural’s Fort Wayne, Indiana distri-
bution center. Article 5 of the agreement prohibits both strikes
and lock-outs during the life of the agreement, with one ex-
ception not applicable here. Article 35 of the agreement con-
tains an “evergreen clause” providing for automatic renewal
of the contract absent written notice of termination or desired
modification at least 60 days prior to the expiration date.
There appears to be no dispute that such notice was given
here, which led to bargaining over the terms of a new agree-
ment.
 Negotiations over a successor agreement commenced in
August 2019 and were ongoing when the expiration date of
the existing agreement came and went on September 14, 2019.
Section 35:03 of the agreement envisions in such circum-
stances that the parties will continue to bargain over a new
agreement in good faith until they reach a “complete agree-
ment and understanding” on a new contract or “until either
or both parties conclude that it is not probable that further
No. 22-1469 3

negotiations will result in an agreement.” R. 1-1 at 34, § 35:03
¶ 1. So long as negations are ongoing, all terms and provisions
of the existing CBA will continue to apply. Id., ¶ 2. However,
“[i]n the event of a strike, the provisions of this section do not
apply.” Id., ¶ 3.
 Bargaining over a new agreement came to a standstill on
September 20, 2019, without agreement on a new contract and
without additional bargaining dates being scheduled. Union
representatives advised United Natural that Local 414 was
unwilling to meet again until all of the company proposals to
which the Local had previously objected were dropped.
 On December 12, 2019, Local 414 and its members went on
strike and established a picket line at the Fort Wayne distri-
bution center. On December 17, Local 414 members began ad-
ditional picketing at United Natural’s Hopkins, Minnesota,
and Green Bay, Wisconsin distribution centers. According to
the complaint, the purpose of the pickets was to cause work-
ers at those facilities to go on strike as well and, indeed, those
workers honored the picket lines and walked off the job. On
December 18, Local 414 ended the strike at the Fort Wayne
distribution center and ceased picketing at the other two dis-
tribution sites. On July 23, 2020, Local 414 and its members
engaged in another strike at the Fort Wayne distribution cen-
ter and picketed that facility. No picketing was initiated at
United Natural’s other facilities.
 In January 2021, United Natural filed suit against Local
414 pursuant to section 301 of the Labor Management Rela-
tions Act of 1947, 29 U.S.C. § 185, 1 alleging as relevant here

 1 “Suits for violation of contracts between an employer and a labor

organization representing employees in an industry affecting commerce
4 No. 22-1469

that by engaging in the December 2019 and July 2020 strikes,
the Local had violated the no-strike provisions of the CBA,
which according to United Natural, remained in effect on and
after the September 14, 2019, expiration date of the CBA.
United Natural also pursued a state-law claim that the Local
had tortiously interfered with the company’s contractual
rights by inducing union members at other facilities to walk
off the job and breach the no-strike provisions of their own
collective bargaining agreements with United Natural. 2
 As relevant here, Local 414 responded to the suit by mov-
ing to compel arbitration of the section 301 claim, contending
that the parties’ dispute was arbitrable under Article 14 of the
CBA, which lays out a “Grievance and Arbitration Proce-
dure.” R. 25, 26; see Republic Steel Corp. v. Maddox, 379 U.S. 650,
652, 85 S. Ct. 614, 616 (1965) (“As a general rule in cases to
which federal law applies, federal labor policy requires … use
of the contract grievance procedure agreed upon by employer
and union as the mode of redress.”). 3 The pertinent provisions
of Article 14 provide as follows:

as defined in this chapter, or between any such labor organizations, may
be brought in any district court of the United States having jurisdiction of
the parties, without respect to the amount in controversy or without re-
gard to the citizenship of the parties.” 29 U.S.C. § 185(a).
 2 United Natural’s complaint includes claims against the two union

locals representing employees at the Hopkins and Green Bay facilities
who honored Local 414’s picket lines at those facilities. Those claims are
not at issue here.
 3 Separately, Local 414 also argued that United Natural’s section 301

claim for breach of contract should be dismissed because it was filed out-
side of the statute of limitations and because, at the time of the strikes, the
Local had concluded that further negotiations with the company would
not result in a new agreement and consequently, the provisions of the
No. 22-1469 5

 14:01 The aggrieved employee must contact
 his/her supervisor within ten (10) calendar days,
 with any occurrence, differences, disputes or
 complaints arising over the interpretation or ap-
 plication of the contents of this agreement. Any
 issue which cannot be resolved between the ag-
 grieved employee and a supervisor within
 twenty-four (24) hours (one workday) will be
 moved to Step #1 within ten (10) calendar days.
 14:01 Step #1—by conference between the ag-
 grieved employee, shift steward and the shift su-
 pervisor. The [s]hift supervisor will schedule the
 conference with the grievant and steward within
 ten (10) calendar days. Both parties should iden-
 tify information, participants, or witnesses that
 are material to the Step [1] decision. This infor-
 mation can be documented on the grievance or
 notice of discipline. If the supervisor[‘]s position
 is not given within twenty-four (24) hours (one
 work day), or the conference [is] not scheduled
 or the grievance remains unresolved, it will be
 reduced to writing in ten (10) calendar days and
 moved to [S]tep #2.
 Step #2—If no satisfactory adjustment is agreed
 upon in Step #[1], a grievance meeting will be

collective bargaining agreement, including the no-strike provision, were
no longer in effect. The district court rejected those arguments. 2022 WL
767165, at *7–*8. The district court did agree with Local 414, however, that
§ 301 preempted United Natural’s claim against the Local for tortious in-
terference with contract, and the court dismissed that claim. Id., at *9.
Those interlocutory rulings are not before this court in the instant appeal.
6 No. 22-1469

 conducted. The Step 2 Committee will consist of
 the Warehouse Manager and/or Transportation
 Manager, Human Resources Director, or their
 designees, and the Business Agent, or his de-
 signee. The Committee will determine infor-
 mation, participants, or witnesses that are mate-
 rial from the previous step. The Step [2] Com-
 mittee shall have the right to uphold or deny
 said grievance and such decision shall be final
 and binding on the parties. Hearing days will be
 set for the third Wednesday and Thursday of
 each month. These days can be changed by mu-
 tual agreement. At the time the dates are agreed
 to be changed, new dates must be confirmed.
 Grievances filed as a result of such Step #2 hear-
 ing shall be scheduled on the next Step #2
 agenda. By mutual consent of the parties, such
 grievance may be moved directly to Step #3.
 Step #3—If no satisfactory adjustment is agreed
 upon in Step #2, this grievance shall be moved
 to the two (2) person Labor-Management Coun-
 cil. Such Labor-Management Council shall be
 comprised of the Secretary-Treasurer, Team-
 sters Local 414 or his designated representative,
 and the other representative shall be the Gen-
 eral Manager, Fort Wayne Distribution Center
 or his designated representative. Such Council
 shall have the power and authority to settle the
 grievance, and such settlement shall be final
 and binding on the parties. Meetings of this
 Council shall be held no less than quarterly, or
No. 22-1469 7

 as needed, and at such places as the Council
 members may elect.
 Step #4—Arbitration—In the event the Labor-
 Management Council, as described herein, can-
 not reach agreement, the grievance may be sub-
 mitted by either party to the Federal Mediation
 and Conciliation Service. Such a decision to
 move to F.M.C.S. must be done by the local par-
 ties within 30 days of the Step #3 impasse or the
 grievance is considered resolved. If either party
 elects to pursue the case to F.M.C.S., the arbitra-
 tor shall be picked as follows: The F.M.C.S shall
 be requested by either party signatory hereto [to]
 name five (5) arbitrators. The Union and the Em-
 ployer shall alternately strike one (1) name from
 the list of arbitrators with the moving party to
 arbitration striking first. The remaining name
 shall be the [A]rbitrator. The Arbitrator may in-
 terpret the Agreement and apply it to the partic-
 ular case presented to him, but he shall, how-
 ever, have no authority to add to, subtract from,
 or in any way modify the terms of this Agree-
 ment or any agreements made supplementary.
 The decision of the Arbitrator must be awarded
 to the involved parties within thirty (30) calen-
 dar days from the close of the hearing. The thirty
 (30) day period shall commence following re-
 ceipt by the Arbitrator of post-hearing docu-
 ments, such as transcripts, post-hearing briefs,
 etc. There shall be no lockouts, strikes, or work
 stoppages pending the settlement of the griev-
 ance in the manner above outlined.
8 No. 22-1469

 14:03 The Arbitrator shall have the authority to
 make an employee whole, which shall include
 compensation for all wages and benefits which
 he would have received but for the Employer’s
 improper conduct and shall include, but not be
 limited to, overtime pay, holiday pay, funeral
 pay, vacation pay, and sick leave pay.
R. 1-1 at 9–10.
 The district court denied Local 414’s motion to compel ar-
bitration, concluding that the company’s claim for the alleged
breach of the no-strike provision of the CBA was not gov-
erned by the arbitral remedies set forth in Article 14, Step 4 of
the CBA. The court began by noting that § 14:01 requires the
“aggrieved employee” to initiate the grievance and arbitra-
tion procedures set forth in Article 14. “Without action by the
‘aggrieved employee’ …, the procedures in Article 14 are
never implicated.” 2022 WL 767165, at *4. References to the
“aggrieved employee” and to the “grievance” pursued by
that employee are repeated in the other provisions laying out
the various steps in the grievance and arbitration process. Id.
Relying principally on Faultless Div. v. Local Lodge No. 2040 of
Dist. 153, Int’l Machinists & Aerospace Workers, 513 F.2d 987,
990–91 (7th Cir. 1975), the court concluded that the employee-
oriented nature of the CBA’s grievance and arbitration pro-
cess did not give the employer the authority to initiate arbi-
tration over anything except for an employee grievance. Id., at
*5. The court acknowledged that, in this case, unlike Faultless,
Article 14 gives the employer as well as the Union the right to
initiate arbitration at Step 4 of the grievance and arbitration
process. But nothing suggested that the dispute-resolution
No. 22-1469 9

process (including arbitration) applied to anything other than
an employee-instigated grievance. Id.
 The district court was not persuaded to follow the con-
trary conclusion of the court in Eberle Tanning Co. v. Section
63L, FLM Joint Bd., Allegheny Div., United Food & Commercial
Workers Int’l Union, 682 F.2d 430, 432–33 (3d Cir. 1982), which
relied on a CBA’s broad definition of “grievance” (coupled
with a provision for monthly meetings between the parties’
representatives to resolve unsettled grievances, as so defined)
to hold that the arbitration provision at issue in that case ap-
plied to any alleged violation of the agreement or any dispute
over the meaning and application of the agreement terms. The
Third Circuit reasoned that although the first four steps of the
grievance procedure outlined in the CBA were employee-ori-
ented, the CBA’s broad definition of “grievance” gave rise to
an ambiguity as to the reach of the arbitration clause; thus,
consistent with federal labor policy, which strongly favors ar-
bitration, the company was required to arbitrate its dispute
with the union. Id. at 433–34.
 The district court reasoned that the result the court
reached in Eberle Tanning was not warranted in this case given
a key difference in the language of the agreement between
United Natural and Local 414:
 Article 14 defines a grievance only by its refer-
 ence to “any occurrence, differences, disputes or
 complaints arising over the interpretation or ap-
 plication” of the CBA by an “aggrieved em-
 ployee.” The four steps of the grievance proce-
 dure flow from this language. The inclusive lan-
 guage defining a grievance in Eberle Tanning is
 absent from the Fort Wayne CBA, and the CBA
10 No. 22-1469

 fails to evidence any intention by the employer
 to arbitrate its disputes arising from actions of
 the union.
Id., at *6 (emphasis in district court’s opinion).
 II.
 Pursuant to section 16(a) of the Federal Arbitration Act,
the denial of Local 414’s motion to compel arbitration is im-
mediately appealable. 9 U.S.C. § 16(a)(1)(A); Boomer v. AT&T
Corp., 309 F.3d 404, 412–13 (7th Cir. 2002); see also Circuit City
Stores, Inc. v. Adams, 532 U.S. 105, 121 S. Ct. 1302 (2001) (FAA
applies to employment agreements of workers other than
those in maritime, railway, and other transportation indus-
tries); Pryner v. Tractor Supply Co., 109 F.3d 354, 359–60 (7th
Cir. 1997) (arbitration provisions in collective bargaining
agreements applicable to workers other than those transpor-
tation industries are subject to FAA, including section 16).
 We review the district court’s decision denying the motion
to compel arbitration de novo. E.g., Int’l Bhd. of Elec. Workers
Local 2150 v. NextEra Energy Point Beach, LLC, 762 F.3d 592,
593–94 (7th Cir. 2014). For purposes of this appeal, there is no
dispute over the relevant facts. The dispute instead is over
whether the pertinent terms of the collective bargaining
agreement require United Natural to submit its dispute with
Local 414 regarding the strikes to arbitration. This presents a
question of (federal) law. See Geneva Secs., Inc. v. Johnson, 138
F.3d 688, 691 (7th Cir. 1998); Aluminum Co. of Am. v. N.L.R.B.,
159 F.2d 523, 525 (7th Cir. 1946); see also John Wiley & Sons, Inc.
v. Livingston, 376 U.S. 543, 548, 84 S. Ct. 909, 914 (1964) (noting
that “[f]ederal law, fashioned from the policy of our national
labor laws, controls” the interpretation and application of
No. 22-1469 11

collective bargaining agreements) (cleaned up); Merk v. Jewel
Food Stores, Div. of Jewel Cos., 945 F.2d 889, 892 (7th Cir. 1991)
(same).
 The Supreme Court’s jurisprudence has established four
principles that guide our analysis. AT&T Techs., Inc. v.
Commc’ns Workers of Am., 475 U.S. 643, 648, 106 S. Ct. 1415,
1418 (1986). The principles derive in the first instance from the
Steelworkers Trilogy of 1960: United Steelworkers of Am. v. Am.
Mfg. Co., 363 U.S. 564, 80 S. Ct. 1343 (1960); United Steelworkers
of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct.
1347 (1960); and United Steelworkers of Am. v. Enterprise Wheel
& Car Corp., 363 U.S. 593, 80 S. Ct. 1358 (1960). Later cases have
supplied amplification and clarification of these principles.
 First and foremost, it is the parties’ contract that deter-
mines the duty to arbitrate. AT&T Techs., 475 U.S. at 648–49,
106 S. Ct. at 1418 (citing Warrior & Gulf., 363 U.S. at 582, 80
S. Ct. at 1353, and Am. Mfg., 363 U.S. at 570–71, 80 S. Ct. at
1364–65 (Brennan, J., concurring)); Granite Rock Co. v. Int’l Bhd.
of Teamsters, 561 U.S. 287, 299, 130 S. Ct. 2847, 2857 (2010);
Faultless, 513 F.2d at 990; see also Oil, Chem. & Atomic Workers
Int’l Union, Local 7-1 v. Amoco Oil Co., 883 F.2d 581, 584 (7th
Cir. 1989) (describing this as “[t]he foundational principle de-
rived from the Steelworkers Trilogy”). “Arbitration is strictly a
matter of consent and thus is a way to resolve those dis-
putes—but only those disputes—that the parties have agreed to
submit to arbitration.” Granite Rock, 561 U.S. at 299, 130 S. Ct.
at 2857 (emphasis in Granite Rock) (cleaned up). A party can-
not be compelled to arbitrate a particular dispute if it has not
agreed to do so. Warrior & Gulf, 363 U.S. at 582, 80 S. Ct. at
1353; Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery
12 No. 22-1469

Workers Int’l, 370 U.S. 254, 256, 82 S. Ct. 1346, 1348 (1962); see
also Faultless, 513 F.2d at 990.
 Second, whether the parties have agreed to arbitrate a par-
ticular issue is presumptively a question for judicial determi-
nation. John Wiley & Sons, 376 U.S. at 547, 84 S. Ct. at 912–13.
“Unless the parties clearly and unmistakably provide other-
wise, the question of whether the parties agreed to arbitrate is
to be decided by the court, not the arbitrator.” AT&T Techs.,
475 U.S. at 649, 106 S. Ct. at 1418 (collecting cases).
 Third, a court must determine whether a claim is subject
to arbitration without consideration of the underlying merits
of the case. Id. at 649–50, 106 S. Ct. at 1418. Our focus is limited
to what subjects the parties have agreed to arbitrate and
whether the matter at issue is among them. We must resist
any temptation to assess the strength or weakness of the claim
for any reason, even if it is only to satisfy ourselves that the
claim is not frivolous. See ibid.; Am. Mfg., 363 U.S. at 568–69,
80 S. Ct. at 1346–47; Amoco Oil, 883 F.2d at 584.
 Fourth, where the contract includes an arbitration clause,
but the language of that clause is ambiguous as to whether it
applies to the particular matter at hand, there is a rebuttable
presumption of arbitrability in the sense that “[a]n order to
arbitrate the particular grievance should not be denied unless
it may be said with positive assurance that the arbitration
clause is not susceptible to an interpretation that covers the
asserted dispute. Doubts should be resolved in favor of cov-
erage.” Warrior & Gulf, 363 U.S. at 582–83, 80 S. Ct. at 1353;
Granite Rock, 561 U.S. at 301, 130 S. Ct. at 2858–59; AT&T
Techs., 475 U.S. at 650, 106 S. Ct. at 1419; see also NextEra Energy
Point Beach, 762 F.3d at 594. “Such a presumption is particu-
larly applicable where the clause is as broad as” one
No. 22-1469 13

providing for the arbitration of any dispute related to the in-
terpretation of the agreement or the parties’ performance
thereunder. AT&T Techs., 475 U.S. at 650, 106 S. Ct. at 1419.
 Turning to the grievance and arbitration procedure set
forth in the agreement between Local 414 and United Natural,
what is immediately apparent is that the process is employee-
oriented from beginning to end. Section 14:01 provides that it
is “[t]he aggrieved employee” who must contact his or her su-
pervisor “with any occurrence, differences, disputes or com-
plaints arising over the interpretation or application of the
contents of this agreement.” Thus, at the very outset, the
agreement indicates that the grievance and arbitration proce-
dure is one meant to address employee concerns and dis-
putes. That focus is reinforced in the outline of Step 1 of the
grievance process, which involves a conference between the
“aggrieved employee,” the shift steward, and the shift super-
visor. The next two steps on the grievance procedure proceed
from that initial meeting. The fourth step is arbitration, which
may be initiated by either party, as to a grievance that remains
unresolved at the conclusion of Step Three in the resolution
process.
 The provision for arbitration is not a stand-alone arbitra-
tion clause allowing either party to arbitrate anything and
everything that might arise under the collective bargaining
agreement. Rather, it constitutes the final step in a four-step
procedure designed to resolve a particular set of grievances.
The only type of grievance referenced in these four steps is an
employee-initiated grievance; no mention is made of an em-
ployer-initiated grievance. See Adirondack Transit Lines, Inc. v.
United Transp. Union, Local 1582, 305 F.3d 82, 87 (2d Cir. 2002)
(although agreement permitted either party to request
14 No. 22-1469

arbitration, “in this case we have an arbitration clause that
narrowly limits arbitration to those disputes that have pro-
ceeded through the grievance procedure after filing by the
union”); Lehigh Portland Cement Co. v. Cement, Lime, Gypsum,
& Allied Workers Div., 849 F.2d 820, 824–25 (3d Cir. 1988) (“The
introductory language [of the contract’s grievance and arbi-
tration procedure] explicitly identifies the grievance proce-
dure as belonging to the employee. … Each subsequent step
in the grievance procedure is contingent upon the preceding
steps, each of which requires that the grievance be prosecuted
by an employee.”). Section 14:03 then lays out the arbitrator’s
remedial power “to make an employee whole,” including
compensation for lost wages and benefits, confirming that ar-
bitration is intended as a means of resolving the employee-
initiated disputes referenced in the preceding provisions de-
scribing the grievance procedure. Nowhere does the contract
signal that the reach of the arbitration provisions is meant to
be broader than that of the grievance process and, if so, what
types of additional issues the parties agreed to submit to arbi-
tration. Cf. Laundry, Dry Cleaning & Dye House Workers Int’l
Union, Local 93 v. Mahoney, 491 F.2d 1029, 1032–33 (8th Cir.
1974) (en banc) (although contractual grievance procedure
was employee-oriented, contract’s broad “purpose” lan-
guage, coupled with savings clause providing for arbitration
of matters other than grievances, triggered Warrior & Gulf pre-
sumption that wage dispute was subject to arbitration).
 The process as laid out in the agreement is thus one lim-
ited to employee grievances, and it is those grievances that the
parties agreed to arbitrate. This stands in marked contrast to
the arbitration clause at issue in Drake Bakeries, for example,
which reflected the parties’ intent to submit all of their
No. 22-1469 15

respective disputes to the specified grievance and arbitration
procedure:
 The parties agree that they will promptly at-
 tempt to adjust all complaints, disputes or
 grievances arising between them involving
 questions of interpretation or application of any
 clause or matter covered by this contract or any
 act or conduct or relation between the parties
 hereto, directly or indirectly.
370 U.S. at 257, 82 S. Ct. at 1348. The agreement then set forth
a multi-step procedure for resolving such disputes, culminat-
ing in arbitration at the request of either party. The quoted
language describing the scope of the grievance and arbitra-
tion procedure was, as the Court said, “broad language, in-
deed,” ibid., and absent qualification plainly swept within its
reach the employer’s claim that the union had violated the no-
strike provision of the agreement, id. at 25––60, 82 S. Ct. at
1349-50; see also Pietro Scalzitti Co. v. Int’l Union of Operating
Eng’rs, Local No. 150, 351 F.2d 576, 579 (7th Cir. 1965) (“While
the contract language before us [which requires resort to
grievance and arbitration procedure “whenever any differ-
ence or dispute shall arise as to interpretation or application
of the terms of this Agreement …”] may not be wholly iden-
tical to the arbitration clause in Drake Bakeries, yet the instant
contract excludes nothing from arbitration and clearly falls
within the rationale of Drake Bakeries.”); Reid Burton Constr.,
Inc. v. Carpenters Dist. Council, 535 F.2d 598, 602 (10th Cir.
1976) (although initial language regarding scope of contrac-
tual grievance and arbitration procedure was ambiguous,
subsequent language providing that “[i]f the two parties are
unable to reach a settlement, the dispute shall be reduced to
16 No. 22-1469

writing and the aggrieved party shall notify the other party
the dispute is being referred to the Board of Adjustment”
made clear that either party could initiate the procedure). In
this case, however, the parties have outlined a grievance and
arbitration procedure that is confined to employee griev-
ances. True, the agreement does not directly define the term
“grievance,” nor does it expressly state that the claims and
complaints of the employer are excluded from this process
(including arbitration), see Drake Bakeries 370 U.S. at 257, 82
S. Ct. at 1348–49 (distinguishing Atkinson v. Sinclair Refining
Co., 370 U.S. 238, 82 S. Ct. 1318 (1962), overruled in part on other
grounds by Boys Markets, Inc. v. Retail Clerks Union, Local 770,
398 U.S. 235, 90 S. Ct. 1583 (1970), on this basis). But in de-
scribing a process that from start to finish involves employee
grievances alone, with no mention anywhere of employer-in-
itiated disputes, the agreement unmistakably conveys the
message that the dispute resolution procedure, including the
provision for the arbitration of unresolved grievances, is one
applicable solely to employee grievances. See Adirondack
Transit Lines, 305 F.3d at 87–88.
 Given the wholly employee-focused character of the pro-
cess set forth in the CBA, our decision in Faultless makes clear
that United Natural is not obligated to arbitrate its dispute
over the strikes. Faultless focused on the employee-oriented
nature of an agreement’s grievance and arbitration procedure
to conclude that the agreement did not permit the employer
to initiate its own grievances and take them to arbitration. The
agreement in this case is materially no different. Indeed, the
language of section 14:01, emphasizing that it is the “ag-
grieved employee” who initiates the process, is even stronger
than the comparable language at issue in Faultless. It is true
that the final step of the procedure at issue in Faultless
No. 22-1469 17

permitted only the Union to take an unresolved grievance to
arbitration, whereas in this case, the agreement permits either
party at Step Four to take such a grievance to arbitration. But
we are not convinced that this difference is material, let alone
dispositive.
 Both parties have an obvious interest in how the provi-
sions of the collective bargaining agreement are interpreted
and applied, and to that extent both have a corresponding in-
terest in the guidance that a neutral arbitrator might supply
on disputed issues. To be sure, arbitration awards are not
precedential in the same way that judicial decisions are, see
Bhd. of Locomotive Eng’rs & Trainmen Gen. Comm. of Adjustment,
Cent. Region v. Union Pac. R.R. Co., 522 F.3d 746, 754–55 (7th
Cir. 2008), but arbitration nonetheless is a key way of giving
meaning to the terms of a collective bargaining agreement. See
United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 63–64, 101 S. Ct.
1559, 1564 (1981) (citing Warrior & Gulf, 363 U.S. at 581, 80
S. Ct. at 1352), overruled in part on other grounds by DelCostello
v. Int’l Bhd. of Teamsters, 462 U.S. 151, 103 S. Ct. 2281 (1983). So
it does not surprise us that the company would insist on hav-
ing the same right as the union to take an unresolved griev-
ance to arbitration, regardless of who initiated the grievance.
See G.T. Schjeldahl Co. v. Local Lodge 1680 of Dist. Lodge No. 64
of Int’l Ass’n of Machinists, 393 F.2d 502, 504 (1st Cir. 1968).
 It remains the case here that the grievance procedure out-
lined in Article 14 is otherwise entirely oriented toward em-
ployee grievances and does not speak to employer grievances.
The fact that the agreement gives the employer the right to
take such a grievance to arbitration does nothing to create am-
biguity as to whether the company’s own claims might be
18 No. 22-1469

subject to arbitration. 4 Indeed, as we have also noted, the con-
cluding provision regarding the arbitrator’s remedial author-
ity confirms that the scope of the grievance and arbitration
procedure is confined to issues and disputes raised by the em-
ployee, not the employer. And, finally, for what it is worth,
Faultless noted the union’s exclusive right to initiate arbitra-
tion as a circumstance that made the employer’s case against
being compelled to arbitrate “stronger” than was the case in
G.T. Schjeldahl, where the arbitration clause, like the one at is-
sue here, gave both parties the right to demand arbitration.
Faultless, 513 F.2d at 992. We did not indicate that the differ-
ence was dispositive. Indeed, the First Circuit in G.T.
Schjeldahl had likewise concluded that the employer’s dispute
was not subject to arbitration, despite the mutuality of the ar-
bitration clause. 393 F.2d at 504.
 Nor does the Third Circuit’s decision in Eberle Tanning
suggest to us that there is an ambiguity in the CBA which
might bring the presumption in favor of arbitration into play.
Eberle Tanning cited two principal reasons for concluding that
the grievance and arbitration provisions in the agreement at
issue in that case were ambiguous, first among them the
agreement’s broad definition of “grievance” to include any
and all disputes about the interpretation and application of
the terms of the agreement. It is true that § 14:01 uses language

 4 The arbitration clause provides, inter alia, that “[t]he Arbitrator may

interpret the Agreement and apply it to the particular case presented to
him … .” R. 1-1 at 10, § 14:03, Step #4. We do not view the use of the term
“case” as suggesting that arbitration might be available as a means of re-
solving disputes other than employee-initiated grievances, nor are we
convinced that the use of that term gives rise to an ambiguity as to the
scope of the clause.
No. 22-1469 19

similar to that highlighted by the Third Circuit in Eberle Tan-
ning—specifically, the reference “any occurrence, differences,
disputes or complaints arising over the interpretation or ap-
plication of the contents of this agreement”—but here the sen-
tence containing that language begins with qualifying lan-
guage indicating that it is “[t]he aggrieved employee” who must
contact his/her supervisor in reference to such an occurrence,
difference, dispute, or complaint. That key limiting language
eliminates the first of two ambiguities relied on by the Third
Circuit. See Jim Walter Resources, Inc. v. United Mine Workers,
663 F.3d 1322, 1328 (11th Cir. 2011) (notwithstanding aspira-
tional language in the contract encouraging the resolution of
disputes through contractual means rather than by litigation,
“the employee oriented grievance machinery in the parties’
contract qualifies and limits the universe of claims and griev-
ances subject to arbitration, and the language negates the in-
tention that the employer’s claim for damages must be sub-
mitted to arbitration”); United Parcel Serv., Inc. v. Int’l Bhd. of
Teamsters, 1998 WL 699670, at *4 (N.D. Ill. Sept. 30, 1998)
(Bucklo, J.) (where first sentence of contract section setting
forth grievance and arbitration procedure was “open-ended”
but was followed by language describing grievance proce-
dure that was “completely employee-oriented,” Faultless ap-
plied and contract did not require employer to arbitrate its
claim).
 The second provision cited by the court in Eberle Tanning
as giving rise to ambiguity was a clause giving the employer
as well as the union the right to take unresolved grievances to
arbitration. Indeed, Eberle Tanning distinguished our decision
in Faultless on this basis. 682 F.2d at 435 n.6. Given how
broadly the contract in Eberle Tanning defined “grievance,”
the fact that both parties had a right to request arbitration
20 No. 22-1469

could be read to suggest that the employer’s claims and dis-
putes were subject to arbitration just as those of union mem-
bers were. Here too the CBA gives the company as well as the
Local the right to demand arbitration, but the language of the
agreement makes clear that what can be arbitrated are griev-
ances that have not been resolved at prior steps in the dispute
resolution procedure; and as we have been at pains to empha-
size, that procedure from the very start is focused on em-
ployee grievances and no other category of disputes. We have
just explained why the employer might reasonably want the
right to ask for arbitration of unresolved employee griev-
ances. So the fact that the CBA gives United Natural that au-
thority does not give rise to an ambiguity here as it did in
Eberle Tanning.
 As the district court emphasized, the focus on “the ag-
grieved employee” limits the universe of disputes arising
from the agreement that are subject to the grievance and arbi-
tration procedure, and the four delineated steps in that proce-
dure flow from this initial, limiting provision. See Friedrich v.
Local No. 780, IUE-AFL-CIO-CLC, 515 F.2d 225, 229 (5th Cir.
1975) (“Although [the arbitration clause] permits either party
to request arbitration, it limits [that right] to disputes not re-
solved after Step 6 of the grievance procedures of Article VII.
Thus, by requiring all arbitrable disputes to have passed
through the employee-oriented steps of the mandatory griev-
ance procedures, this agreement limits arbitration to em-
ployee initiated disputes.”); Jim Walter Resources, 663 F.3d at
1327; Affiliated Food Distribs., Inc. v. Local Union No. 229, 483
F.2d 418, 420–21 (3d Cir. 1973); G.T. Schjeldahl, 393 F.2d at 504.
 Local 414 insists that it makes no sense to construe the
CBA’s arbitration clause as limited to employee-instigated
No. 22-1469 21

grievances. The result, the Local emphasizes, is that although
an employee grievance related to a strike would be subject to
arbitration, the employer’s own claim as to the propriety of
the strike would not. That is a fair point, although one might
draw a distinction between an employee’s individual, fact-
bound contention that she was improperly disciplined for
participating in a strike, for example, and the employer’s
baseline contention that the strike itself was contrary to the
provisions of the parties’ contract. In any event, our task is to
construe the agreement as written, and where the contract
language is plain as it is here, our task is to give effect to that
language rather than to second-guess the manner in which the
parties drafted the agreement.
 In short, there is no ambiguity in the CBA which might
trigger the presumption in favor of arbitration. The grievance
and arbitration procedure that the parties have agreed to is
focused exclusively on employee-initiated grievances and
does not envision or apply to employer-initiated grievances.
We can say with confidence that the arbitration clause is not
reasonably susceptible to an interpretation that includes an
employer-initiated dispute regarding the meaning and appli-
cation of the terms of the agreement. Thus, United Natural is
not obligated to submit its dispute over the two strikes to ar-
bitration.
 III.
 We AFFIRM the district court’s judgment.