In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 24-2056

JOSHUA HARRIS and DONITA OLDS, on behalf of plaintiffs and the class members described herein,

*Plaintiffs-Appellees*,

*v.*

W6LS, INC., doing business as WITHU and WITHU LOANS, and CALIBER FINANCIAL SERVICES, INC.,

*Defendants-Appellants*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:23-cv-16429 — **Lindsay C. Jenkins,** *Judge*.

_____

ARGUED FEBRUARY 12, 2025 — DECIDED MARCH 31, 2026

AMENDED JUNE 5, 2026

_____

Before PRYOR, KOLAR, and MALDONADO, *Circuit Judges*.

KOLAR, *Circuit Judge*. Plaintiffs went online and borrowed $600 from defendants at interest rates of nearly 500% per year. They later sued, invoking their consumer rights under Illinois and federal law. Defendants sought to enforce an arbitration

provision in their loan contracts delegating all questions of arbitrability to the arbitrator, while also requiring that these questions be resolved under a body of tribal contract law that did not exist at the time the plaintiffs took out their loans. It is well-established, however, that "arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). And contracts require mutual assent. Here, defendants drafted an arbitration agreement directing an arbitrator to apply a body of law that did not exist, which they maintained a unilateral ability to invent. Absent any indication that the plaintiffs intended this, we find no mutual assent. We, therefore, affirm the district court's order denying defendants' motion to compel arbitration.

## I. Background

Defendant W6LS, Inc. offers consumer loans online as "WithU Loans." Caliber Financial Services, Inc. manages the underwriting and collection of the online loans given out by W6LS. W6LS and Caliber are corporations organized under the laws of the Otoe-Missouria Tribe of Indians. The Tribe maintains an ownership stake in the defendants.[1]

Plaintiffs are two Illinois citizens who took out online loans from WithU in 2022 and 2023. Joshua Harris borrowed

---

[1] The parties dispute the precise nature of the defendants' relationship to the Tribe. Defendants, in an effort to claim tribal sovereign immunity, assert that they are "economic arms of, and wholly owned, managed, and controlled by, the Otoe-Missouria Tribe of Indians." Plaintiffs, meanwhile, have alleged that the Tribe is merely a "nominal" owner, and that all substantive aspects of defendants' business are run by persons unaffiliated with the Tribe. While this dispute might be relevant to whether defendants can avail themselves of the Tribe's sovereign immunity on the merits, we need not resolve this dispute here.

$600 with an annual interest rate of 498.63%. Donita Olds similarly took out a $600 loan at an annual interest rate of 497.25%. Both of the loans violate Illinois's statutory limits on interest. *See* 815 ILCS 123/15-5-5.

The Loan Agreements for Harris's and Olds's loans contain an Arbitration Agreement. According to the agreement, an arbitrator will decide all "claims or disputes arising from or relating in any way to: the interpretation, applicability, validity, arbitrability, enforceability, formation or scope of any Loan Agreement or this Arbitration Agreement." In plain English, the agreement delegates to the arbitrator the "threshold" questions of whether the parties agreed to arbitrate their disputes and whether the claims at issue fall within the scope of that agreement.

The Arbitration Agreement states that the arbitrator should use "Applicable Law," which is defined elsewhere in the Loan Agreement as "Tribal Law and applicable federal law," to resolve these questions. "Tribal law" refers to law enacted by the Otoe-Missouria Tribe or the Otoe-Missouria Consumer Finance Services Regulatory Commission. The Tribe adopted a Tribal Contract Code on May 2, 2024, but this code was not in place at the time Harris and Olds entered into the Loan Agreements. *See* Otoe-Missouria Tribe of Indians, Resolution OTMC #0502061 (May 2, 2024) ("Tribal Contract Code").[2]

The Tribal Contract Code defines a contract and sets out the elements of contract formation, who can contract, defenses, a statute of frauds, and modes of interpretation. The

---

[2] The Tribal Contract Code appears on the district court docket at entry number 36-1.

Code has several provisions that apply to loan contracts, although none set a cap on the interest rate to be charged. The Code also says that it applies retroactively to "all applicable contracts that become effective on or after April 1, 2018." Although the Code describes some defenses to the formation or enforcement of a contract, there are no provisions that address unconscionability—we are aware of no state that takes the same approach.

The Loan Agreement disclaims application of any other law aside from the Tribe's law and applicable federal law. It states that "[t]he Loan and this Agreement are not governed by the law of your state of residence or any other state." Finally, the agreement reiterates that "[t]he arbitrator is bound by the terms of this Arbitration Agreement," and "must apply" tribal law or applicable federal law.

Harris and Olds filed a putative class action against W6LS and Caliber for violations of Illinois's rate-cap and other consumer-protection statutes, as well as the federal Racketeer Influenced and Corrupt Organizations Act and Electronic Funds Transfer Act. Defendants filed a motion to compel individual arbitration, which the district court denied. The district court's denial turned on the "prospective waiver" doctrine: it found both the delegation provision and the Arbitration Agreement unenforceable because compelling arbitration under exclusively tribal or "applicable federal law" forced the plaintiffs to prospectively waive their substantive rights under Illinois law.

Defendants immediately appealed the denial as permitted by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 16(a)(1)(C); *United Natural Foods, Inc. v. Teamsters Local 414*, 58 F.4th 927, 932–33 (7th Cir. 2023).

**II. Discussion**

A court should compel arbitration when (1) there was a valid agreement between the parties to arbitrate, (2) the claim at issue falls within the scope of that agreement, and (3) a party has nevertheless refused to arbitrate. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 702 (7th Cir. 2022). We review *de novo* the denial of a motion to compel arbitration. *United Natural Foods*, 58 F.4th at 933.

"[A]rbitration is strictly a matter of consent." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (citation omitted). Thus, in order to compel arbitration, a court must first determine that the parties agreed to arbitrate their disputes. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010); *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022). Parties can go one step further and agree to let the arbitrator decide "'gateway' questions of 'arbitrability'" such as if that agreement is enforceable or whether the disputes at issue are within the scope of the agreement. *Rent-A-Center*, 561 U.S. at 68–69.

This additional step is often called a "delegation provision," because it reflects the parties' decision to delegate arbitrability to the arbitrator instead of having the courts decide. *Id*. A delegation provision is "an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 69–70. Delegation is an exception to the general rule that arbitrability is a question for the courts, so the party seeking delegation must show the parties' intent to delegate arbitrability by "clear and unmistakable evidence." *Coinbase*, 602 U.S. at 149 (internal alterations removed) (citing *AT&T Techs., Inc. v. Commc'ns*

*Workers*, 475 U.S. 643, 649 (1986)); *United Natural Foods*, 58 F.4th at 933–34.

In applying this rule, we recognize as a background principle that "Congress adopted the [FAA] in an effort to counteract judicial hostility to arbitration and establish a liberal federal policy favoring arbitration agreements." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120 (2019) (quotation omitted). We thus "place arbitration agreements upon the same footing as other contracts" when determining their validity. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 437 (2020) (cleaned up). This reflects "the fundamental principle that arbitration is a matter of contract." *Rent-A-Center*, 561 U.S. at 67.

Accordingly, under § 2 of the FAA, all arbitration agreements and delegation provisions "may be invalidated by generally applicable contract defenses." *Id*. at 68 (cleaned up). The Supreme Court has held, however, that "[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Id*. at 70–71 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006)). Thus, a court may still order arbitration if a party fails to "challenge[] specifically" the arbitration (or delegation) provision rather than "the contract as a whole." *Id.* But "where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase*, 602 U.S. at 151 (citing *Rent-A-Center*, 561 U.S. at 71).

Here, both the delegation provision and the Arbitration Agreement fail for the same reasons: both agreements, by selecting then-nonexistent tribal law and inapplicable "federal law" of contract to control their disputes, lacked mutual

assent at the time of contracting. We proceed in three steps. First, we determine which law of contract formation applies, concluding that under *either* Illinois or tribal law, mutual assent is required. Second, we conclude that the delegation and arbitration provisions of the Loan Agreements lacked mutual assent, as they selected non-existent law to govern future disputes. Third, we consider an alternative basis for affirmance: the prospective waiver doctrine.[3]

### A. Choice of Law

Courts apply "ordinary state-law principles that govern the formation of contracts" to determine "whether the parties agreed to arbitrate a certain matter (including arbitrability)." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As to which state's law would apply to questions of

---

[3] In taking this approach, we affirm on a basis not relied on by the district court but argued by the parties in supplemental briefing. The district court based its decision solely on prospective waiver, and the parties framed their initial arguments on appeal on that singular issue. As we discuss below, however, it remains an open question whether the prospective waiver doctrine applies to state statutory rights. *Infra* pp. 15–16. Formation, on the other hand, is a clear prerequisite for delegation and arbitration, and provides a narrower path to resolving this case on the facts before us. *See K.F.C.*, 29 F.4th at 837 ("Even the most sweeping delegation cannot send the contract-formation issue to the arbitrator[.]"). And we may generally affirm the district court's judgment on any ground supported by the record. *See, e.g., E.D. by Duell v. Noblesville Sch. Dist.*, 151 F.4th 907, 914 n.1 (7th Cir. 2025); *see Kass v. PayPal Inc.*, 75 F.4th 693, 700 (7th Cir. 2023) (noting a motion to compel arbitration is procedurally akin to a summary judgment motion). Cognizant that the parties had not framed the issue as one of formation on appeal, we requested supplemental briefing on formation as to the arbitration and delegation provisions of the Loan Agreements. Both parties have now had the opportunity to fully brief and be heard on this issue.

formation, "we would normally respect the law chosen in the [parties'] agreement." *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011).

That approach presents a challenge here. The Loan Agreement specifies "Tribal law and applicable federal law"—not state law—as the applicable law, further defining "Tribal law" as "any law, ordinance or regulation duly enacted by the Tribe or the Otoe-Missouria Consumer Finance Services Regulatory Commission." But the "applicable law" is the FAA, which does not "provide a substantive law governing the formation or general interpretation of contracts." *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 991 (7th Cir. 2024); *see also Druco Rests., Inc. v. Steak N Shake Enters.*, 765 F.3d 776, 781–82 (7th Cir. 2014). And the Otoe-Missouria Tribe adopted its Contract Code in May 2024, after Harris took out his loan in 2023 and Olds took out hers in 2022. Thus, the Tribal Contract Code submitted to the district court did not exist at the time the parties purportedly designated it as the law governing the arbitration and delegation provisions. At the time of the contract, the bodies of law mentioned in the governing law provision—federal and tribal—provided no rule of contract formation and defense.

Defendants urge, nonetheless, that because the Tribal Contract Code now exists and expressly states that its terms apply retroactively, it governs questions of formation. This assumes, of course, that parties *may* substitute tribal law for "ordinary state-law principles," *First Options*, 514 U.S. at 944—which we have yet to resolve. Plaintiffs counter that Illinois law—the law of the forum state—should govern questions of formation.

Ultimately, we need not decide between tribal law and Illinois law in this case because they share the same basic formation requirements, including mutual assent (or "consent" as phrased in the Tribal Contract Code) to the essential terms of the agreement. *Compare Kass v. PayPal Inc.*, 75 F.4th 693, 701 (7th Cir. 2023) (citing *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20), *with* Tribal Contract Code § 10 (requiring mutual consent), *and id.* § 24 ("Consent is not mutual unless the parties all agree upon the same terms and conditions setting forth the parties' respective obligations and rights under the contract[.]"). Though we lack judicial opinions applying the Tribal Contract Code's mutual-consent requirement, neither party argues there is any daylight between "mutual consent" under the Code and "mutual assent" under Illinois law. We thus cite Illinois caselaw with the assumption, given the parties' briefs, that the same rules apply under tribal law. *See Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome." (quotation omitted)).

### B. Mutual Assent

A valid contract requires "offer, acceptance, and consideration," and "there must also be mutual assent as to the contract's terms." *Kass*, 75 F.4th at 701 (quotation omitted). Those terms must be so definite that "the promises and performances to be rendered by each party are reasonably certain." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 547 F.3d 882, 888 (7th Cir. 2008) (quoting *Acad. Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991)). Even though "some contract terms may be missing or left to be agreed upon, … essential terms" must be certain. *Acad. Chicago Publishers*, 144 Ill. 2d at 30. And

without "mutual assent as to the terms of the contract," there is no enforceable contract. *Id*. "[W]e look at the parties' intent to be bound and the agreement on the material terms *at the time of contracting*, not in its aftermath." *In re Broiler Chicken Antitrust Litig.*, 167 F.4th 430, 439 (7th Cir. 2026) (citing *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387–89 (7th Cir. 1999)).

Here, the lack of definiteness in the contract's Governing Law provision contradicts any mutual assent to the delegation or arbitration provisions. The contract purports to have the arbitrator use "applicable federal law" or Otoe-Missouria tribal law to determine the "interpretation, applicability, validity, arbitrability, enforceability, formation or scope of … this Arbitration Agreement." But as discussed above, federal law does not provide underlying principles of contract formation and there was no tribal law for an arbitrator to apply when plaintiffs signed their contracts. We cannot, then, "ascertain what the parties have agreed to do" in committing their future disputes to arbitration. *Bus. Sys. Eng'g, Inc.*, 547 F.3d at 888 (quoting *Acad. Chicago Publishers*, 144 Ill. 2d at 29). Since it was not "reasonably certain" what law Harris and Olds, or for that matter WithU Loans, Inc., agreed would be used in arbitration, they cannot have mutually assented to the delegation or arbitration terms. *Id.*[4]

---

[4] Defendants suggest that applicable tribal law *did* exist prior to the signing of the Loan Agreements, citing a Consumer Financial Services Ordinance that the Tribe adopted in 2018. But that ordinance, beyond requiring that loan agreements include certain notices, simply restates that "[t]he Loan is made within the Tribe's jurisdiction and governed by Tribal law and applicable federal law"; it does not provide substantive rules of

*Jackson v. Payday Financial, LLC* provides a useful analogy. In that case, the plaintiffs entered agreements for high-interest loans with a provision assigning future disputes to arbitration "which shall be conducted by the Cheyenne River Sioux Tribal Nation." 764 F.3d 765, 769 (7th Cir. 2014). As it turned out, the Cheyenne River Sioux Tribal Nation had no arbitration procedures, process for hiring arbitrators, or rules to govern consumer disputes—it was a purely "illusory forum." *Id*. at 776. Though we ultimately found the arbitration clause unenforceable based on (among other things) unconscionability under Illinois law, we noted that "mutuality of intent … [was] not at all apparent" because "[t]he loan consumers did not agree to arbitration under any and all circumstances, but only to arbitration under carefully controlled circumstances—circumstances that never existed." *Id*. at 781. That same logic applies here: plaintiffs agreed to arbitrate and delegate gateway questions of arbitrability on the understanding that *some* law would govern in that alternative forum. But that law did not exist at the time of contracting. Indeed, it did not exist until *after* plaintiffs filed their action in federal court. We cannot say, therefore, that there was a "meeting of the minds" as to an essential element of the parties' bargain to arbitrate: the substantive law that would bind the arbitrator.

We pause to distinguish the language at issue here from the run-of-the mill choice-of-law provision. A chosen jurisdiction's law will change over time and parties may validly accept the risk posed by this change as part of their contract. The difference here is that the Otoe-Missouria Tribal Contract Code was completely nonexistent at the time the parties

contract. Otoe-Missouria Tribe of Indians, Resolution OTMC #050341 § 6.2 (May 3, 2018), https://perma.cc/2X58-7UNN.

entered into the delegation and arbitration agreements. It is one thing for parties to agree to be bound by a settled body of law that is subject to later *change*; it is quite another to select a non-existent body of law, which is subject to later *invention*. The latter provides no basis for us to conclude that the parties shared a mutual understanding as to what law would govern their future disputes.

That absence of mutual understanding is particularly evident here where the Otoe-Missouria Tribe of Indians—with the unilateral ability to create applicable tribal law—has a proprietary and financial interest in the defendant corporations. Nothing in the record suggests that defendants disclosed—or that plaintiffs knew—that the Tribe both owned the defendants and retained the ability to draft its law to materially disadvantage plaintiffs in a future dispute, such as by omitting unconscionability as a defense to enforcement.

Defendants cite cases where we have enforced arbitration agreements despite holding that a choice-of-law provision is unenforceable or inapplicable. *See Faulkenberg*, 637 F.3d at 809 (applying Illinois law as argued by parties rather than Texas law contained in choice-of-law provision); *Stawski Distrib. Co. v. Browary Zywiec S.A.*, 349 F.3d 1023, 1026 (7th Cir. 2003) (enforcing arbitration agreement despite finding choice-of-law provision unenforceable). But this misunderstands the argument here: it is not that the Governing Law provision is *unenforceable*—we make no ruling on that question—but that the Governing Law provision, in this case, *reflects* the parties' lack of mutual assent as to delegation and arbitration at the time of contracting.[5] The provision simultaneously reflects the

---

[5] Without making any holding as to unconscionability in this case, we recognize that under Illinois law the mutual assent inquiry may turn on

parties' desire to choose governing law as an integral part of the dispute resolution process and frustrates that very end by specifying law that does not exist.

Defendants assert that plaintiffs *cannot* contest formation as to the delegation or arbitration provisions because their statutory claims presume the existence of an agreement: the agreement to issue loans at allegedly unlawful rates. But defendants confuse the broader Loan Agreement—or "container contract"—with the nested agreements to arbitrate future disputes and delegate questions of arbitrability. *See MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020). There is no doubt that plaintiffs agreed to take out loans at the rates they now claim were unlawful. But the Supreme Court has made clear that agreements to arbitrate or delegate questions of arbitrability are "severable" from the container contract and, indeed, from each other. *Buckeye*, 546 U.S. at 445; *Rent-A-Center*, 561 U.S. at 72; *see also Sauer-Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 350 (7th Cir. 1983) ("The agreement to arbitrate and the agreement to buy and sell … are separate."). Thus, we view the delegation and arbitration provisions as separate agreements—and a formation challenge to either does not presume the invalidity of the container contract. *Cf. MZM*, 974 F.3d at 397–98 (noting that in the other direction, a formation challenge to the *container* contract may apply to a nested arbitration agreement).

---

facts that go to both the intent of the parties and unconscionability. *See Greenfield v. Ervin Cable Constr., LLC*, 2025 IL App (5th) 240210-U, ¶ 45, *as modified on denial of reh'g* (Mar. 25, 2025) ("[M]any of the trial court's findings on the issue of mutual assent would also apply to the issue of procedural unconscionability.").

Plaintiffs challenge the formation of the delegation and Arbitration Agreements specifically, not the Loan Agreement as a whole. They do not contend that the Governing Law provision was an "essential" term to the container contract. Setting up a dispute-resolution procedure under non-existent law is no doubt material to that separate and severable Arbitration Agreement, but that is not necessarily so for a broader agreement to borrow money. *Rent-A-Center*, 561 U.S. at 71; *cf. Jackson*, 764 F.3d at 778 (finding choice-of-forum provision unenforceable where "it was not possible for the Plaintiffs to ascertain the dispute resolution processes and rules to which they were agreeing"); *Broiler Chicken*, 167 F.4th at 439 (materiality must be evaluated "in the context of the particular contract" based in part on "the purpose that [the parties] sought to accomplish" (quotations omitted)).

In contrast, the same mutual-assent argument that invalidates the delegation provision "applies equally" to the Arbitration Agreement itself, which is controlled by the same choice-of-law provision. *Coinbase,* 602 U.S. at 151. As with delegation, the parties intended to arbitrate their disputes according to a predetermined body of governing law but chose sources of law (federal and tribal) that would provide an arbitrator with no substantive rules of contract with which to resolve those future disputes. Indeed, given the Tribe's ability to unilaterally draft rules of contract formation and defense directly for defendants' benefit, it is unclear that what the parties "agreed" to could even be termed "arbitration" under the FAA at all. *See Flores v. New York Football Giants, Inc.*, 150 F.4th 172, 184–85 (2d Cir. 2025) (affirming denial of motion to compel arbitration where "the late unilateral designation of an adviser to the [defendant] as arbitrator neither provides for an even facially independent arbitral forum, nor remedies the

[defendant's] unilateral contractual authority over both the substance of [plaintiff]'s statutory claims and the procedures governing their alleged 'arbitration'"). There was, therefore, no meeting of the minds as to this essential element of their agreement to arbitrate.

In holding that the parties did not mutually assent to the specific delegation provision and Arbitration Agreements in this case, we do not mean to cast doubt on other contracts entered under the auspices of Otoe-Missouria tribal law prior to the enactment of the Tribal Contract Code. Depending on the language of other agreements, the absence of governing law chosen by the parties may not relate to an essential term, or there may be alternative law that *does* provide substantive rules of decision. But on the record before us, we cannot conclude that the parties mutually assented to arbitrate (including on issues of arbitrability) where their specific agreement directed the arbitrator to apply a body of governing law that did not exist at the time of contracting.

### C. Prospective Waiver

Defendants face another hurdle to enforcing the arbitration provision: the "effective vindication" or "prospective waiver" doctrine. The doctrine reflects the broad principle that arbitration provides only an alternative forum for resolving disputes and should not change the nature of the underlying rights at issue. It stems from language in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, where the Supreme Court held that a corporation could be compelled to arbitrate its Sherman Act claim against another corporation: "By agreeing to arbitrate a statutory claim, a party *does not forgo the substantive rights* afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." 473

U.S. 614, 628 (1985) (emphasis added). This passage has been read to stand for the notion that a party cannot "prospectively waive" their substantive rights just by agreeing to arbitrate their claims. Applying this principle, the district court found the Arbitration Agreement unenforceable because it required plaintiffs to prospectively waive their Illinois state-law rights in arbitration.

The Supreme Court's prospective-waiver cases have generally involved federal statutory rights. *See, e.g.*, *id.* at 626–28 (Sherman Act); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995) (Carriage of Goods by Sea Act); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (Age Discrimination in Employment Act). *But see Preston v. Ferrer*, 552 U.S. 346, 360 (2008) (holding that prospective waiver did not invalidate arbitration agreement where plaintiff "relinquishe[d] no substantive rights … California law may accord him"). Defendants thus argue that the prospective-waiver doctrine only applies to rights created by federal law, not those created by state law. They cite Justice Kagan's 2013 dissent in *American Express Co. v. Italian Colors Restaurant*, which other courts have read to imply that the prospective-waiver doctrine does not apply to state-law substantive rights. *See* 570 U.S. 228, 252 (2013) (Kagan, J., dissenting) ("Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another *federal* law[.]"); *Dr.'s Assocs., LLC v. Tripathi*, 794 F. App'x 91, 94 (2d Cir. 2019) (nonprecedential order); *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 935–36 (9th Cir. 2013).

In 2022, however, the Supreme Court again mentioned the prospective-waiver doctrine and, in a footnote, suggested that it was "not … unique [to] federal statutes." *Viking River*

*Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 n.5 (2022). *Viking River Cruises*, therefore, at the very least strongly suggests that an arbitration agreement like defendants' impermissibly forces borrowers to prospectively waive their state-law rights.

We take no issue with the district court's decision to rely on prospective waiver, but we do not find it necessary to do the same. Because we find that defendants' motion to compel arbitration fails on ordinary formation principles, we need not reach the untrodden ground of prospective waiver of state-law rights post-*Viking River Cruises* and leave that question for another day.

### III. Conclusion

The judgment of the district court is AFFIRMED.